STATE of Minnesota, Respondent,

v.

Ronald HILL, Appellant.

No. A09–1947.

Supreme Court of Minnesota.

Aug. 24, 2011.

Lori Swanson, Attorney General; and John Choi, Ramsey County Attorney, Mark Nathan Lystig, Assistant County Attorney, St. Paul, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Theodora Gaïtas, Assistant State Public Defender, St. Paul, MN, for appellant.

## OPINION

STRAS, Justice.

A jury found appellant Ronald Hill guilty of the first-degree premeditated murder of Jeffrey Logan. The district court convicted Hill of that offense and sentenced him to life imprisonment with-

out the possibility of release. Hill challenges his conviction on three grounds. First, he argues that the district court abused its discretion when it permitted the State to impeach him with a prior, unspecified felony conviction. Second, he contends that the State committed prosecutorial misconduct when it elicited testimony that, unlike other suspects who volunteered DNA samples, the State obtained Hill's DNA sample through a search warrant. Third, he asserts that the district court erred when it permitted the State to present evidence that Hill used a stolen gun to shoot Logan. We affirm Hill's conviction.

## I.

On January 31, 2009, Hill shot and killed Jeffrey Logan outside the American Legion club on Concordia Avenue in St. Paul. Hill was indicted on charges of first-degree premeditated murder, Minn.Stat. § 609.185(a)(1) (2010), first-degree felony murder, Minn.Stat. § 609.185(a)(3) (2010), second-degree murder, Minn.Stat. § 609.19, subd. 1(1) (2010), first-degree aggravated robbery, Minn.Stat. § 609.245, subd. 1 (2010), and possession of a firearm by an ineligible person, Minn.Stat. § 624.713, subd. 1(2) (2010).

At trial, the State presented testimony from five eyewitnesses to the shooting. Logan's cousin, E.B., testified that he and a high school friend met Logan at the American Legion club, and that the three men left the club together around 1:00 a.m. Logan and E.B. were walking to Logan's car together when a man—later identified as Hill—approached Logan and E.B., held out a gun with a red laser targeting sight, and repeatedly demanded that E.B. hand over his wallet. E.B. threw all of the money contained in his pockets on the ground and asked that Hill "just leave."

At some point during the exchange, Logan pulled out his Sig Sauer pistol and hit Hill on the head with it. The three men then began to fight, and E.B. testified that during the altercation, Logan pulled Hill's shirt off. Even though both E.B. and Logan attempted to restrain Hill, Hill broke free and started shooting at Logan. Four eyewitnesses testified that they saw Logan run toward the alley at the far end of the parking lot as a shirtless Hill chased and continued to fire at Logan. The eyewitnesses testified that Logan fell to the ground and raised his right hand toward Hill in a pleading gesture, but Hill stood over Logan and shot him multiple times. None of the eyewitnesses testified that they saw a gun in Logan's hand at the time he was shot. Hill and two other men fled the scene in a black Lincoln Continental. St. Paul police officers chased and eventually apprehended Hill and the Lincoln's other two occupants, E.W. and H.R.

The State introduced forensic evidence corroborating the eyewitness testimony. The medical examiner testified that Logan suffered six bullet wounds—through his right palm, through his left knee, in his groin, and three others in his thighs and buttocks. According to the medical examiner, Logan died from excessive blood loss. The medical examiner also testified that the location and trajectory of the bullet wounds were consistent with the eyewitness accounts of the shooting.

The police found three handguns while investigating Logan's death. The Sig Sauer registered to Logan was found in the Lincoln, and an Iver Johnson revolver and a nine millimeter Beretta pistol with a red laser targeting sight were found under a deck next door to where police apprehended H.R., one of the occupants of the Lincoln. Of the three recovered firearms, only the Beretta was a possible match to the bullets and shell casings recovered at

the scene of the crime. In addition, only Hill's DNA could not be excluded as a match to samples found on the Beretta and Sig Sauer.

Hill was the sole witness for his defense and his testimony contradicted much of the evidence presented by the State. Hill testified that, on the night of the shooting, he left the American Legion club with two friends, E.W. and H.R. According to Hill, E.W. said that he had been involved in a prior altercation with men resembling Logan and E.B. At E.W.'s insistence, Hill then approached Logan and E.B. to ask whether they knew E.W. and H.R. Hill denied that he attempted to rob E.B. Hill also stated that he did not have a gun until one of his friends handed him the Beretta after Logan pulled out the Sig Sauer. Hill admitted that he fought with E.B. and Logan, but told the jury that he started shooting at Logan because he was afraid that Logan was going to shoot him. Hill further testified that, at the time he was shooting Logan, Logan was standing upright and facing Hill without his hand raised.

Hill told the jury that, after the shooting, he returned to the Lincoln with his friends because he was scared and knew he "did something terrible." Hill stated that once they were in the Lincoln, E.W. claimed the Beretta belonged to him and grabbed it with gloved hands. Hill testified that someone threw the Sig Sauer into the back seat and that is when he touched it for the first time.

The jury found Hill guilty of all four counts of the indictment, as well as a lesser-included charge of second-degree felony murder, Minn.Stat. § 609.19, sub. 2(1) (2010). The district court convicted Hill of

first-degree premeditated murder, and sentenced him to life imprisonment without the possibility of release. This appeal followed.

## II.

The first question is whether the district court abused its discretion by allowing the State to impeach Hill with evidence of an unspecified felony conviction.[1] In September 2008, Hill was convicted of robbery in Illinois. The court weighed the probative impeachment value against the potential prejudicial effect in admitting the 2008 Illinois robbery conviction. The court concluded that, because of the similarity between the 2008 conviction and the aggravated robbery count in this case, the State could only present evidence that Hill was convicted of an unspecified felony in September 2008. The court prohibited the State from "referenc[ing] what the conviction was for" because of the potential prejudicial effect of the evidence.

In accordance with the district court's evidentiary ruling, Hill responded "Yes" to the following question by defense counsel: "Now in September of 2008, you were convicted of a felony, correct?" The court later issued the following limiting instruction during its final charges to the jury: "In the case of the Defendant, you must be especially careful to consider any previous conviction only as it may affect the weight of the Defendant's testimony. You must not consider any previous conviction as evidence of guilt of the offenses for which the Defendant is on trial." Hill asserts that the court abused its discretion in allowing the admission of a "sanitized" version of his 2008 felony conviction. We disagree.

---

1. For purposes of this opinion, we will use the terms "unspecified" and "sanitized" felony conviction interchangeably to refer to the admission of evidence that a witness has committed a prior felony conviction without revealing the nature or details of the conviction at the time of impeachment.

■ We will not reverse a district court's ruling on the impeachment of a witness by prior conviction "absent a clear abuse of discretion." *State v. Ihnot,* 575 N.W.2d 581, 584 (Minn.1998). Minnesota Rule of Evidence 609(a), the rule at issue here, provides as follows:

> For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect, or (2) involved dishonesty or false statement, regardless of the punishment.

We have never addressed whether a party may impeach a witness through an unspecified felony conviction under Rule 609(a)(1). "When interpreting the Minnesota Rules of Evidence, we first look to the plain language of the rule." *State v. Stone,* 784 N.W.2d 367, 370 (Minn.2010). Rule 609(a) permits impeachment of witnesses by two types of convictions: crimes "punishable by death or imprisonment in excess of one year" and crimes involving "dishonesty or false statement, regardless of the punishment." As Rule 609(a) provides, a party must introduce "evidence that [a] witness *has been convicted* " of either a felonious crime or a crime of dishonesty as a threshold requirement for the admission of prior conviction evidence. (Emphasis added.) Once that threshold requirement has been satisfied, the rule does not further require the impeaching party to offer evidence about the details or nature of the conviction at the time of impeachment at trial. In other words, the nature of the prior conviction—whether it is a felony or crime of dishonesty—is relevant only to a court's preliminary determination of admissibility. The rule, there-

fore, does not prohibit impeachment through an unspecified felony conviction so long as the impeaching party can make a threshold showing that the underlying conviction falls into one of the two categories of admissible convictions under Rule 609(a).

The foregoing interpretation of Rule 609(a) is consistent with the origins and history of the rule. At common law, witnesses convicted of treason, felonies, crimes involving dishonesty, or obstruction of justice were incompetent to testify at trial. 1 John W. Strong, *McCormick on Evidence* § 42 (5th ed.1999). Such crimes were considered "infamous" because they "impl[ied] such a dereliction of moral principle, as carries with it a conclusion of a total disregard to the obligation of an oath." Simon Greenleaf, *Evidence* § 373 (1842), *quoted in* 2 John Henry Wigmore, *Evidence in Trials at Common Law* § 520 (Chadbourn rev.1979). Courts reasoned that prior "disregard for the law may suggest to the fact finder similar disregard for the courtroom oath." *Commonwealth v. Fano,* 400 Mass. 296, 508 N.E.2d 859, 863 (1987) (citation omitted).

■ Rule 609(a) relaxes the common law by permitting witnesses convicted of infamous crimes to testify at trial, but incorporates the common law rationale by permitting impeachment of those witnesses through their prior convictions. Impeachment through prior convictions allows the fact-finder to make credibility determinations by seeing " 'the whole person' ... to judge better the truth of his testimony." *State v. Brouillette,* 286 N.W.2d 702, 707 (Minn.1979) (citations omitted). We have noted that " '[l]ack of trustworthiness may be evinced by [the defendant's] abiding and repeated contempt for laws which he is legally and morally bound to obey.' " *Id.* (quoting

*State v. Duke*, 100 N.H. 292, 123 A.2d 745, 746 (1956)). Under both our approach to Rule 609(a) and the common law tradition, it is the general lack of respect for the law, rather than the specific nature of the conviction, that informs the fact-finder about a witness's credibility, at least with respect to convictions other than those involving dishonesty or false statements. In other words, *any* felony conviction is probative of a witness's credibility, and the mere fact that a witness is a convicted felon holds impeachment value. *See, e.g., State v. Williams*, 771 N.W.2d 514, 518 (Minn. 2009); *State v. Moorman*, 505 N.W.2d 593, 604 (Minn.1993); *State v. Gassler*, 505 N.W.2d 62, 66–67 (Minn.1993); *State v. Bias*, 419 N.W.2d 480, 487 (Minn.1988); *State v. Amos*, 347 N.W.2d 498, 502 (Minn.

1984); *State v. Lloyd*, 345 N.W.2d 240, 246–47 (Minn.1984).

Accordingly, we adopt the majority rule that Rule 609(a) permits a party to impeach a witness with unspecified felony convictions.[2] We do not suggest, however, that a party must always impeach a witness with an unspecified felony conviction. To the contrary, the decision about what details, if any, to disclose about the conviction at the time of impeachment is a decision that remains within the sound discretion of the district court. To exercise that discretion properly, a district court must weigh the probative value of admitting the evidence against its prejudicial effect. Minn. R. Evid. 609(a). If a court finds that the prejudicial effect of disclosing the nature of a felony conviction outweighs its

**2.** Our research reveals that a number of other jurisdictions have addressed the admissibility of unspecified felony convictions for impeachment purposes. Fifteen jurisdictions grant trial courts discretion about whether to admit unspecified felony convictions as impeachment evidence: the First Circuit (*United States v. Powell*, 50 F.3d 94, 102 (1st Cir. 1995)); the Tenth Circuit (*United States v. Howell*, 285 F.3d 1263, 1268–69 (10th Cir. 2002)); Alaska (*City of Fairbanks v. Johnson*, 723 P.2d 79, 84 (Alaska 1986)); Connecticut (*State v. Geyer*, 194 Conn. 1, 480 A.2d 489, 498 (1984)); the District of Columbia (*Goodwine v. United States*, 990 A.2d 965, 968 (D.C. 2010)); Florida (*Fulton v. State*, 335 So.2d 280, 284 (Fla.1976)); Idaho (*State v. Shepherd*, 94 Idaho 227, 486 P.2d 82, 84–85 (1971)); Massachusetts (*Commonwealth v. Ioannides*, 41 Mass.App.Ct. 904, 668 N.E.2d 845, 846 (1996)); Nevada (*Plunkett v. State*, 84 Nev. 145, 437 P.2d 92, 93–94 (1968)); New Jersey (*State v. Brunson*, 132 N.J. 377, 625 A.2d 1085, 1092–93 (1993)); New Mexico (*State v. Williams*, 76 N.M. 578, 417 P.2d 62, 65 (1966)); New York (*People v. Hayes*, 97 N.Y.2d 203, 738 N.Y.S.2d 663, 764 N.E.2d 963, 966 (2002)); Oregon (*State v. Sims*, 298 Or. 360, 692 P.2d 575, 577 (1984)); South Dakota (*State v. Means*, 363 N.W.2d 565, 569 (S.D.1985)); and Washington (*State v. Gomez*, 75 Wash.App. 648, 880 P.2d 65, 69–70 (1994)).

Four jurisdictions have gone as far as creating a per se rule confining impeachment to the mere fact of conviction and prohibiting the admissibility of any details about a prior conviction: Kentucky (*Sebastian v. Commonwealth*, 436 S.W.2d 66, 69 (Ky.1968)); Nebraska (*State v. Olsan*, 231 Neb. 214, 436 N.W.2d 128, 136 (1989)); Wisconsin (*Voith v. Buser*, 83 Wis.2d 540, 266 N.W.2d 304, 306–07 (1978)); and Virginia (*Harmon v. Commonwealth*, 212 Va. 442, 185 S.E.2d 48, 51 (1971)).

On the other hand, six jurisdictions prohibit impeachment by unspecified felony convictions: the Second Circuit (*United States v. Estrada*, 430 F.3d 606, 614–16 (2d Cir.2005)); Illinois (*People v. Cox*, 195 Ill.2d 378, 254 Ill.Dec. 720, 748 N.E.2d 166, 171 (2001)); Tennessee (*State v. Galmore*, 994 S.W.2d 120, 122 (Tenn.1999)); Maryland (*Bells v. State*, 134 Md.App. 299, 759 A.2d 1149, 1155 (2000)); Michigan (*People v. Van Dorsten*, 409 Mich. 942, 298 N.W.2d 421, 421 (1980)); and Utah (*State v. Crawford*, 60 Utah 6, 206 P. 717, 719 (1922)).

The Minnesota Court of Appeals recently adopted the minority rule prohibiting impeachment by unspecified felony convictions in *State v. Utter*, 773 N.W.2d 127, 132 (Minn. App.2009). We overrule *Utter* because it is inconsistent with our interpretation of Rule 609(a).

probative value, then it may still allow a party to impeach a witness with an unspecified felony conviction if the use of the unspecified conviction satisfies the balancing test of Rule 609(a)(1).

█ Five factors guide the exercise of a district court's discretion under Rule 609(a): "(1) the impeachment value of the prior crime, (2) the date of the conviction and the defendant's subsequent history, (3) the similarity of the past crime with the charged crime ..., (4) the importance of the defendant's testimony, and (5) the centrality of the credibility issue." *State v. Jones*, 271 N.W.2d 534, 538 (Minn.1978). In this case, the district court engaged in a discussion of each of the five factors. First, the court found that the prior conviction had impeachment value "because it allow[ed] the jury to see the whole person of the Defendant." Second, the date of the conviction—just four months before the murder—was relevant to its impeachment value. Third, "the similarity of the past crime to the crime charged ... weigh[ed] against the admissibility of the crime." Fourth, the court indicated that the defendant's testimony would provide a contrasting version of events from that presented by the State. Fifth, Hill's credibility was a "key issue" given "all of the evidence" in the record. Weighing all of the factors, the court concluded that the probative impeachment value of a sanitized version of Hill's felony conviction outweighed its prejudicial effect.

Because the court properly and carefully balanced the potential probative value and prejudicial effects of the proffered impeachment evidence, we hold that the district court did not abuse its discretion when it admitted evidence of Hill's prior, unspecified felony conviction for impeachment purposes under Minn. R. Evid. 609(a).

## III.

█ We next address whether the State committed prosecutorial misconduct by eliciting evidence that the State obtained Hill's DNA sample through a search warrant, while other suspects involved in the case volunteered DNA samples. At trial, Sergeant Patricia Englund provided the jury with a demonstrative explanation of the procedure to collect buccal swabs for DNA testing, and then engaged in the following colloquy with the prosecutor:

[THE STATE]: And how were you able to obtain a[DNA] sample from [E.W.]?

[ENGLUND]: I asked [E.W.] if he would provide me with a consent sample of his DNA. He signed a written consent sample and then I obtained a sample of the DNA.

[THE STATE]: Did you obtain any other DNA samples in this case?

[ENGLUND]: I did.

[THE STATE]: Who else did you obtain samples from?

[ENGLUND]: I obtained a DNA sample from Mr. Ronald Hill.

[THE STATE]: And did you follow the same procedures on Mr. Hill?

[ENGLUND]: I did.

[THE STATE]: How did you obtain his sample?

[ENGLUND]: I obtained a search warrant that authorized me to take a sample of his DNA.

Sergeant Bryant Gaden later testified that he collected a voluntary DNA sample from H.R. Hill alleges that the officers' testimony implied that Hill refused to submit to DNA testing because "Hill, unlike his co-defendants, had something to hide." Hill failed to object to any of the foregoing testimony at trial or move to strike it from the trial record.

When a defendant fails to object to an alleged error at trial, we review for plain error. *See State v. Ramey,* 721 N.W.2d 294, 298 (Minn.2006); *see also* Minn. R.Crim. P. 31.02. In applying plain error analysis, we will reverse trial error only if there is (1) error, (2) that is plain, and (3) the error affects the defendant's substantial rights. *Ramey,* 721 N.W.2d at 302. If those three prongs are satisfied, we then assess "whether [we] should address the error to ensure fairness and the integrity of the judicial proceedings." *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998).

For claims of prosecutorial misconduct, we apply a modified substantial rights test. *See Ramey,* 721 N.W.2d at 302. Rather than placing the burden of persuasion on the defendant to show that a trial error has affected his or her substantial rights, the State bears the burden of persuasion on claims of prosecutorial misconduct to demonstrate that "the misconduct did not affect substantial rights." *Id.* Thus, in claims involving prosecutorial misconduct, the State must show that there is "no reasonable likelihood that the absence of the misconduct in question 'would have had a significant effect on the verdict of the jury.'" *Id.* (citation omitted).

We have held that requiring a defendant to surrender a DNA sample constitutes a search under the Fourth Amendment to the United States Constitution. *See* U.S. Const. amend. IV; *see also State v. Jones,* 753 N.W.2d 677, 686 (2008) ("Absent exceptions ..., a warrant supported by probable cause is necessary to obtain a sample of an individual's DNA."). In addition, "[i]t is a violation of the defendant's right to due process for a prosecutor to comment on a defendant's failure to consent to a warrantless search." *Jones,* 753 N.W.2d at 687 (citing *United States v. Runyan,* 290 F.3d 223, 249 (5th Cir.2002)).

A due process violation occurs when the State presents "*direct* evidence that [the defendant] failed to consent to a search," but not when the State creates "an inference based on little more than speculation" that a defendant did not consent to the search. *Id.*

The State did not violate Hill's due process rights when it elicited testimony that it obtained Hill's DNA through a search warrant. In *Jones,* we rejected the claim that mentioning the procurement of a search warrant in connection with the collection of a defendant's DNA sample violates due process. 753 N.W.2d at 686–87. We reasoned that such evidence, at most, "invite[s] an inference that [a defendant] failed to consent to a search," which "is not sufficient to constitute a violation of due process." *Id.* at 687.

But here the State also mentioned that other suspects in the case, E.W. and H.R., volunteered their DNA samples. Hill argues, therefore, that eliciting evidence about the consent of other suspects violated Hill's due process rights. Although the officers' testimony about E.W. and H.R. was not direct evidence that Hill refused to consent to the search, we decline to decide whether the State violated Hill's due process rights because any alleged error in eliciting the testimony did not affect Hill's substantial rights. In other words, the State has met its burden of showing that there is no reasonable likelihood that the evidence in question had a significant effect on the jury's verdict. *See State v. Prtine,* 784 N.W.2d 303, 315 (Minn.2010) (declining to decide whether the State committed prosecutorial misconduct because, "even if there was misconduct, it did not affect [the defendant's] substantial rights").

When deciding whether an alleged plain error affected a defendant's substan-

tial rights, we consider the following three factors: (1) the strength of the evidence against the defendant; (2) the pervasiveness of the improper conduct; and (3) whether the defendant had an opportunity (or made efforts) to rebut the prosecutor's improper suggestions. *State v. Davis,* 735 N.W.2d 674, 682 (Minn.2007). We address each of these factors in turn.

## A.

■ The State presented strong evidence that Hill was guilty of first-degree premeditated murder. Eyewitness testimony established that Hill chased Logan across the parking lot prior to the shooting. Chasing a victim before committing a homicide is circumstantial evidence of premeditation. *See, e.g., State v. Holliday,* 745 N.W.2d 556, 564 (Minn.2008). Eyewitnesses also saw Hill with a gun in his hand, standing over Logan, who was laying on the ground with his hand raised in a pleading gesture. At that point, Hill had time "to consider, plan or prepare for, or determine" whether to shoot Logan. Minn.Stat. § 609.18 (2010) (defining premeditation as "to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission"); *see also State v. Cooper,* 561 N.W.2d 175, 180 (Minn.1997) ("A finding of premeditation does not require proof of extensive planning or preparation to kill, nor does it require any specific period of time for deliberation."). Rather than retreat or back away, Hill decided to shoot Logan multiple times and then consummate his escape while Logan bled to death in the parking lot. *See State v. McArthur,* 730 N.W.2d 44, 50 (Minn.2007) (stating that premeditation may be evidenced by "a defendant's concern with escape rather than with rendering aid to the victim").

Hill's primary defense at trial was that he acted in self defense, but the evidence supporting his self-defense theory was weak. Forensic evidence showed that Logan's right hand was open and empty at the time of the shooting. Furthermore, as stated above, numerous eyewitnesses testified that they saw Hill chase Logan across the parking lot, stand over him, and shoot him multiple times. None of these witnesses saw a gun in Logan's hand when the shooting occurred. Moreover, Hill's testimony at trial undermined his claim of self defense. The district court instructed the jury that it could acquit based on Hill's self-defense claim if "there was no reasonable possibility of retreat to avoid the danger." Hill, however, admitted that he could have retreated prior to the shooting: "I could have walked away. That's the right thing to do. That's what I should have done."

Hill nonetheless argues that the disputed testimony was prejudicial because it allowed the jury to infer that his testimony was not credible and he "had something to hide." In cases involving a claim of self defense, as here, the credibility of the defendant is important because the jury must often decide between competing accounts of the events leading up to the crime. *See, e.g., Davis,* 735 N.W.2d at 680. ("[T]he viability of [the defendant's] self-defense claim turned largely on facts that only he could testify to, thus his credibility was central to the case.").

In this case, however, the State called into question Hill's credibility through means independent of the allegedly improper DNA testimony. First, Hill's statements to investigators in the wake of the shooting contradicted his trial testimony. When police initially apprehended Hill, Hill lied by identifying himself as his brother. When Hill later spoke with investigators during his initial interview, he denied any knowledge of the shooting. During that interview, Hill also lied about

subjects unrelated to the shooting, such as his middle name, where he attended high school, and whether he knew the nicknames of the other suspects in the Lincoln. At trial, Hill admitted that he lied to investigators during the interview. And during cross-examination, the State highlighted each of these inconsistencies for the jury in a line of questioning that spans six pages of the trial transcript.

Second, Hill's account of the shooting contradicted the physical evidence. Hill testified that, at the time the shooting occurred, Logan was standing and facing Hill, but the medical examiner testified that Logan's wounds indicated that he was facing away from the shooter because three bullets entered Logan's buttocks and the back of his thighs. The medical examiner further testified that the bullet that entered Logan's scrotal sac and traveled upward through his body was consistent with eyewitness accounts that Logan was lying on the ground at one point during the shooting. Hill also denied chasing Logan with the gun, but could not explain why Logan was shot several feet from where Hill initially approached Logan and E.B.

Accordingly, strong evidence supported Hill's conviction for first-degree premeditated murder.

### B.

The allegedly improper prosecutorial conduct was not pervasive. The State did not emphasize at trial that E.W. and H.R. volunteered DNA samples. In fact, the State elicited the purportedly erroneous testimony regarding E.W. and H.R. from separate witnesses who testified on different days of the trial. In between the testimony at trial of Sergeants Englund and Gaden, who testified about securing DNA from E.W. and H.R. respectively, another witness testified about an unrelated matter. Furthermore, the State did not discuss Hill's failure to consent to DNA testing or the fact that E.W. and H.R. voluntarily provided DNA samples in *either* opening or closing statements. *See State v. Larson,* 788 N.W.2d 25, 32–33 (Minn.2010) (finding that the district court's erroneous ruling that the State could address the defendant's refusal to voluntarily submit to DNA testing was harmless in part because the State did not refer to this evidence during its closing argument).

### C.

Finally, Hill had multiple opportunities to rebut the allegedly improper testimony, but failed to do so. Hill cross-examined Sergeant Englund, but declined an opportunity to cross-examine Sergeant Gaden. Hill could have elicited testimony from either witness regarding his constitutional right to refuse a request by police to provide a DNA sample. *See Jones,* 753 N.W.2d at 688 ("[T]he jury was [informed] that search warrants are acquired for reasons other than the invocation of one's constitutional rights."). Hill also failed to call any witnesses or offer evidence to rebut the allegedly improper inferences that the jury might draw from the testimony that other suspects in the case voluntarily submitted DNA samples. Defense counsel, when addressing the DNA evidence in closing argument, elected not to rebut any improper inferences the jury might have drawn from that evidence.

Therefore, we conclude that Hill is not entitled to a new trial because the alleged error did not affect his substantial rights.

### IV.

The next question is whether the district court erred when it admitted evidence that Hill shot Logan with a gun stolen during a home invasion. According

to Sergeant Englund, a trace run by the Bureau of Alcohol, Tobacco, and Firearms revealed that M.B. was the registered owner of the Beretta used to shoot Logan. Sergeant Englund learned through a conversation with M.B. that the gun was stolen from M.B.'s gun safe on January 13, 2009—less than three weeks before the shooting. Hill neither objected to Sergeant Englund's testimony nor made a motion to strike it from the trial record.

The State also called M.B., who verified that he was the registered owner of the Beretta and that the gun was stolen during a home invasion. During direct examination, M.B. described the theft in considerable detail: "They went up into my garage and they took my sledge hammer, a big pick ax I had in there and [sic] ax and some crow bars, went in there and just hacked a huge hole in the bottom of the [gun safe] door." M.B. admitted on cross-examination that he did not know the identity of the person who stole the Beretta, which prompted defense counsel to make a motion to strike M.B.'s testimony in its entirety. When the district court denied counsel's motion, it stated: "I am somewhat concerned about the admissibility of that evidence because it does involve other occurrences, and I don't think it's clear what the purpose of that evidence was...." The court then instructed the jury to consider M.B.'s testimony "as it relates to the history and the status of the 9 millimeter Beretta and only for that purpose."

Hill argues the district court abused its discretion in admitting any testimony relating to the home invasion and the stolen Beretta. According to Hill, the testimony was irrelevant, unfairly prejudicial, and constituted impermissible *Spreigl* evidence. The State responds that the testimony about the Beretta and the home invasion was neither unduly prejudicial nor irrelevant, and it did not constitute impermissible *Spreigl* evidence because it gave the jury "a complete history of the Beretta."

### A.

As an initial matter, the parties disagree about the applicable standard of review. Hill argues that our review of the district court's evidentiary rulings—including review for relevance, undue prejudice, and the admissibility of *Spreigl* evidence—is for an abuse of discretion and harmless error. *See State v. Pearson,* 775 N.W.2d 155, 160 (Minn.2009) (undue prejudice); *State v. Schulz,* 691 N.W.2d 474, 477 (Minn.2005) (relevance); *State v. Spaeth,* 552 N.W.2d 187, 193 (Minn.1996) (*Spreigl* evidence). For its part, the State argues that Hill's claim is subject to plain-error review because Hill never objected to Sergeant Englund's testimony and failed to make a timely objection to M.B.'s testimony. *See State v. Martinez,* 725 N.W.2d 733, 738 (Minn.2007); *see also* Minn. R. Evid. 103(a) (requiring "a timely objection or motion to strike" to properly preserve a claim that evidence was erroneously admitted at trial).

It is undisputed that Hill failed to object to Sergeant Englund's testimony, and the State does not assert that Hill's motion to strike M.B.'s testimony was untimely. We could therefore review the admission of Sergeant Englund's testimony for plain error and M.B.'s testimony for harmless error. The difficulty in applying a bifurcated standard of review here, however, is that Sergeant Englund's and M.B.'s testimony overlapped, at least with respect to the home invasion and the stolen Beretta. Sergeant Englund testified to her conversations with M.B., who provided a first-party account of the theft of the Beretta at trial. Rather than trying to differentiate overlapping evidence and then apply two

separate standards of review, we will subject all of the disputed testimony to harmless error review because, even assuming the admission of M.B.'s and Sergeant Englund's testimony was erroneous, any error by the district court did not affect Hill's substantial rights under either standard. *See* Minn. R.Crim. P. 31.01, 31.02; *see also State v. Reed,* 737 N.W.2d 572, 583–84 (Minn.2007) (explaining that both harmless error and plain error review require that, for an error to be reversible, it must affect a defendant's substantial rights). In other words, even under harmless error review—which is the less onerous standard for a criminal defendant seeking reversal of his or her conviction or sentence—Hill cannot show "a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." *State v. Courtney,* 696 N.W.2d 73, 84 (Minn.2005).

### B.

Any error in admitting M.B.'s and Sergeant Englund's testimony regarding the home invasion and the stolen Beretta was harmless for several reasons. First, the district court instructed the jury that it was only to consider the testimony for the single, limited purpose of showing "the history and status" of the gun used to shoot Logan. *See State v. Riddley,* 776 N.W.2d 419, 428 (Minn.2009) (explaining that a cautionary instruction by the district court is relevant to an assessment of whether an evidentiary error was harmless). The court instructed the jury as follows:

> Members of the jury, the State has introduced evidence that [M.B.'s] house was burglarized and guns were stolen on January 13th. The Defendant, Ronald Hill, is not charged with nor is he being tried for any crimes related to that incident on January 13th. The evidence from [M.B.] was admissibility [sic] as it

relates to the history and the status of the 9 millimeter Beretta and only for that purpose.

We presume that the jury followed the instructions given by the court, *id.,* and thus the jury did not use the testimony to conclude that Hill was involved in either the home invasion or the theft of M.B.'s Beretta.

Second, the State did not "dwell[ ] on the evidence in closing argument." *Id.* To be sure, the State twice mentioned the stolen gun during close arguments. The State first argued that Hill was not credible because he was "rolling around St. Paul with a guy with a warrant for his arrest in a car with two guns, one of which was stolen." The State then rebutted Hill's self-defense theory by asking the jury: "Who was the aggressive one here, Mr. Logan or the Defendant who had a gun with a laser sight on it, *a stolen gun,* a recent bullet wound, with a get away [sic] car ready, two friends ready to go, another gun in the car and who shot until the gun jammed?" (Emphasis added.) But the State did not dwell on the fact that the gun was stolen, instead mentioning it in conjunction with other actions by Hill that were undisputed and independently supported by admissible evidence. *See Courtney,* 696 N.W.2d at 80–81 (concluding that the prosecution's limited mention of an erroneously-admitted statement during opening and closing arguments did not prevent a finding of harmless error).

Third, the evidence of Hill's guilt was strong, if not overwhelming. *See Riddley,* 776 N.W.2d at 428 (identifying the strength of the evidence as a factor in harmless error review). As stated above, strong evidence contradicted Hill's theory of self defense, including forensic evidence and eyewitness testimony. Moreover, Hill admitted during his testimony that he

could have retreated rather than shooting Logan, which if credited by the jury, defeated Hill's self-defense claim. Finally, the evidence in this case established that Hill had more than adequate time and opportunity to form the requisite mens rea for premeditated first-degree murder.

Accordingly, we conclude that any alleged error in admitting the testimony of Sergeant Englund and M.B. regarding the home invasion and the stolen Beretta was harmless because there is not a reasonable possibility that the alleged error significantly affected the verdict.

## V.

 Finally, Hill argues that he is entitled to a new trial because the cumulative effect of the alleged errors "improperly impugned Hill's credibility and character," depriving him of his constitutional right to a fair trial. *See State v. Hall,* 764 N.W.2d 837, 847 (Minn.2009). "Cumulative error exists when the 'cumulative effect of the * * * errors and indiscretions, none of which alone might have been enough to tip the scales, operate to the defendant's prejudice by producing a biased jury.'" *State v. Johnson,* 441 N.W.2d 460, 466 (Minn.1989) (alteration in original) (citing *United States v. Samango,* 607 F.2d 877, 884 (9th Cir.1979)). Because we hold that the district court did not abuse its discretion in allowing the State to impeach Hill with an unspecified prior felony conviction, and the cumulative effect of any errors resulting from the admission of disputed testimony did not affect Hill's substantial rights, there has been no violation of Hill's constitutional right to a fair trial.

## VI.

For the foregoing reasons, we conclude there is no reversible error in this case.

Accordingly, we affirm Hill's conviction for first-degree premeditated murder.

Affirmed.

PAGE, Justice (concurring).

I concur in the result. I write separately to note that because the testimony elicited by the prosecutor that E.W. and H.R. had consented to giving a sample of their DNA while a search warrant was required to obtain a sample of Hill's DNA, and because how the DNA samples were obtained was not relevant to the proof of the elements of any of the charged offenses, I would conclude that the prosecutor engaged in misconduct. The only purpose served by pointing out the difference in how the DNA samples were obtained was to suggest that "Hill, unlike his codefendants, had something to hide."