*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1498**

State of Minnesota,
Respondent,

vs.

Rashad Devon Mickelson,
Appellant.

**Filed August 15, 2016
Affirmed
Hooten, Judge**

Hennepin County District Court
File No. 27-CR-14-27599

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Elizabeth R. Johnston, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Leslie J. Rosenberg, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Jesson, Presiding Judge; Schellhas, Judge; and Hooten, Judge.

**U N P U B L I S H E D   O P I N I O N**

**HOOTEN**, Judge

Appellant challenges his convictions of first-degree burglary and fourth-degree criminal sexual conduct, arguing that the district court abused its discretion by allowing

forensic scientists to testify that his fingerprints and palm print matched those recovered at the crime scene and by ruling that he could be impeached with evidence of an unspecified felony conviction. Appellant also claims that his rights were violated under the Confrontation Clause by the state's failure to call a trainee fingerprint examiner as a trial witness and that the victim's in-court identification violated his right to due process. Appellant raises additional issues in a pro se supplemental brief. We affirm.

## FACTS

After she had finished working one evening, P.B. went to visit her daughter and grandson at their first-floor apartment in Minneapolis. P.B. agreed to watch her grandson while her daughter went out with friends. Although P.B. thought that her daughter would be gone for two hours, it ended up being longer, and P.B. ultimately spent the night at the apartment.

P.B. fell asleep on the floor. Because of her bad back, it was not uncommon for her to sleep on the floor. She had a fan set up in an open window blowing on her while she slept. She awoke to her skirt moving "a little bit," but she thought that it was just the fan blowing on her skirt. After feeling this initial movement of her skirt, she felt a second movement that was "big" and "harsh," and her skirt "really flew up, real fast." She knew that someone else was in the apartment because her skirt was up too high for the fan to have been blowing her skirt. She also felt a heat sensation, and she realized that there was a hand between her legs on her inner right thigh. The hand grazed her vagina. She turned her head and saw a foot or a leg and then saw a man standing over her. P.B. started kicking the man repeatedly, and he fell back toward the window. It appeared that the intruder was

2

trying to flee, but P.B., unwilling to let him escape, picked up a coffee table and rammed it into his legs. He fell back into the television, causing it to turn on. A blue light emanated from the television, which allowed P.B. to see the assailant's face. He again seemed like he was trying to flee, but P.B. cut him off and tried to fight him. After he pushed P.B. and threatened to kill her, P.B. realized that she would have to let him leave the apartment.

After the intruder left, P.B. checked on her grandson, who was still sleeping in the bedroom. P.B. went to retrieve her phone to dial 911, but her phone was missing. Having no phone to dial 911, she waited for her daughter to return home. P.B.'s daughter returned shortly after the incident and dialed 911 from her phone. A forensic scientist later arrived at the apartment to process the crime scene for fingerprints.

Nearly a month after the incident, Sergeant Matthew Wente of the Minneapolis Police Department met with P.B. to show her a photographic lineup of suspects. Prior to conducting the lineup, Sergeant Wente indicated to P.B. that he believed her assailant was depicted in one of the photographs. P.B. was not able to identify any of the individuals depicted in the photographs as her assailant.

The state subsequently charged appellant Rashad Devon Mickelson with first-degree burglary and fourth-degree criminal sexual conduct. At trial, P.B. admitted that she did not identify her assailant in the photographic lineup. She stated that she suspected that he was in one of the photographs and that she would have been able to identify him if she had seen a side profile picture of him. During the trial, she identified Mickelson as her assailant, stating, "That is him[;] this is him right there. That is him." She testified that

3

she was 100% certain that Mickelson was the man who attacked her. Mickelson was the only African American male in the courtroom when she identified him.

Forensic scientist Michael Schultz testified regarding the fingerprint evidence. He explained that he compared a latent fingerprint from the exterior of the apartment window to Mickelson's fingerprints using the ACE–V process, an acronym in which each letter corresponds to the steps in the process of examining fingerprints: analysis, comparison, evaluation, and verification. He testified that he identified the latent fingerprint to one of Mickelson's fingerprints. He examined another latent fingerprint and, although initially being unable to reach a conclusion, ultimately identified it as Mickelson's. He also testified that he performed the verification step of the ACE–V process to identify a palm print to the right palm of Mickelson. When asked how confident he was in his findings, Schultz replied, "I am confident, very." Schultz further stated, "[O]nce I feel that I have enough information and agreement that any other trained examiner would come to the same conclusion, I feel comfortable with that being my conclusion."

Another forensic scientist, Jenny Bunkers, also testified about the fingerprint evidence. She testified that she performed the verification step of the ACE–V process. She testified that during verification, she independently examines another forensic scientist's work to determine if she agrees with the conclusion reached. She testified that in her opinion a fingerprint and palm print matched Mickelson's.

Mickelson chose not to testify after the district court ruled that the state would be allowed to impeach him with evidence of an unspecified prior felony conviction. The jury found Mickelson guilty as charged. This appeal follows.

4

# DECISION

## I.

Mickelson argues that the district court abused its discretion by allowing the forensic scientists to testify that the fingerprints and palm print from the crime scene matched his prints. We review the admission of expert testimony for an abuse of discretion. *State v. Ritt*, 599 N.W.2d 802, 810 (Minn. 1999). Minnesota Rule of Evidence 702 governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. The opinion must have foundational reliability. In addition, if the opinion or evidence involves novel scientific theory, the proponent must establish that the underlying scientific evidence is generally accepted in the relevant scientific community.

Mickelson argues "that the scientific community fails to support any conclusion that a partial unknown print may be found with certainty to match a full, known print such that a particular individual may be found to have left the print." To the extent that Mickelson is challenging the scientific community's acceptance of the fingerprint methodology used in this case, this court has previously concluded "that the ACE–V methodology produces scientifically reliable results admissible at trial." *State v. Dixon*, 822 N.W.2d 664, 674 (Minn. App. 2012).

Mickelson argues that, although the fingerprint examiners never used the phrase "to the exclusion of all others," the conclusions that they offered at trial "operated to assure

5

the jury of the same improper degree of certitude." "Minnesota courts have held that experts in various fields may offer opinion testimony 'to a reasonable scientific certainty,' implicitly holding that the phrase does not imply 'to the exclusion of all others.'" *Id.* at 675 (quoting *State v. Bloom*, 516 N.W.2d 159, 168 (Minn. 1994)). Although Schultz and Bunkers did not use the magic words "to a reasonable scientific certainty," their testimony did not imply that they identified the fingerprints as belonging to Mickelson "to the exclusion of all others." Schultz testified that based upon his training and experience, he was very confident in his conclusion that another examiner would reach the same conclusion as he reached in identifying the prints as Mickelson's. Bunkers testified that it was her "opinion" that the prints matched Mickelson. This is not the type of language that implies absolute certainty. Moreover, neither Schultz nor Bunkers testified that the prints matched Mickelson "to the exclusion of all others," and Bunkers specifically conceded on cross-examination that it would be impossible to form an opinion that a fingerprint identification is to the exclusion of all others. The conclusions that Schultz and Bunkers offered were therefore permissible, and the district court did not abuse its discretion by allowing them to testify regarding their conclusions.

## II.

Mickelson argues that his rights under the Sixth Amendment's Confrontation Clause were violated because the state did not call one of the fingerprint examiners as a trial witness. The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. We review de novo whether the admission

6

of evidence violates a criminal defendant's rights under the Confrontation Clause. *State v. Caulfield*, 722 N.W.2d 304, 308 (Minn. 2006). The Confrontation Clause "applies to witnesses against the accused—in other words, those who bear testimony." *Crawford v. Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 1364 (2004). The "admission of a forensic report as evidence violate[s] a defendant's Confrontation Clause rights when the specific technician who ha[s] conducted the forensic analysis [is] not made available at trial, and the defendant ha[s] not had a chance to cross-examine the analyst before trial." *State v. Hawkinson*, 829 N.W.2d 367, 377 (Minn. 2013).

Here, initial testing of the prints was done by a trainee. Both Schultz and Bunkers then independently conducted the verification step of the ACE–V process. Mickelson argues that he was denied his right to confrontation because he did not have the opportunity to cross-examine the trainee. But, the state did not offer any forensic report of the trainee or any of her conclusions to the jury. The state simply elicited testimony from Schultz and Bunkers about what steps they took to reach their conclusion that the prints identified to Mickelson. Schultz testified that during the verification step, "another qualified examiner will confirm the first three steps after the initial examiner has done it, to make sure they are coming to the same conclusion." Schultz and Bunkers offered only their independent conclusions about whether the fingerprints from the crime scene matched Mickelson. Because the state submitted neither the trainee's report nor any out-of-court statements by her, Mickelson's rights under the Confrontation Clause were not implicated.

**III.**

7

Mickelson argues that the district court abused its discretion by allowing the state to impeach him with evidence of an unspecified felony conviction if he chose to testify. Evidence that a witness has been convicted of a felony is admissible for attacking the credibility of the witness if "the court determines that the probative value of admitting this evidence outweighs its prejudicial effect." Minn. R. Evid. 609(a)(1). A district court considers five factors set out in *State v. Jones*, 271 N.W.2d 534, 537–38 (Minn. 1978), when deciding whether prior convictions are admissible for impeachment purposes. *State v. Swanson*, 707 N.W.2d 645, 653 (Minn. 2006). Those factors are:

> (1) the impeachment value of the prior crime, (2) the date of the conviction and the defendant's subsequent history, (3) the similarity of the past crime with the charged crime (the greater the similarity, the greater the reason for not permitting use of the prior crime to impeach), (4) the importance of defendant's testimony, and (5) the centrality of the credibility issue.

*Jones*, 271 N.W.2d at 537–38. "A district court's ruling on the admissibility of prior convictions for impeachment of a defendant is reviewed under a clear abuse of discretion standard." *Swanson*, 707 N.W.2d at 654.

*Impeachment value of prior crime*

"[A] prior conviction can have impeachment value by helping the jury see the whole person of the defendant and better evaluate his or her truthfulness." *Id.* at 655 (quotation omitted). The supreme court has stated that "*any* felony conviction is probative of a witness's credibility, and the mere fact that a witness is a convicted felon holds impeachment value." *State v. Hill*, 801 N.W.2d 646, 652 (Minn. 2011). The district court

8

determined that there was impeachment value of Mickelson's prior conviction because it was "persuaded that some evidence of a felony conviction does go to the issue of whole person" and it would give "the jury the opportunity to understand the whole person." Because this reasoning is consistent with established precedent, the district court did not abuse its discretion by determining that this factor favors admission.

*Date of conviction and defendant's subsequent history*

Evidence of a conviction to impeach the credibility of a witness is generally not admissible if more than ten years have elapsed since the date of the conviction. *See* Minn. R. Evid. 609(b). Although the crime that the state sought to use for impeachment was committed after the commission of the offenses here, the impeachment conviction date was approximately five months before the trial in this case. The district court stated that because the conviction "happened shortly after the incident in question in this case, and the conviction occurred not long ago . . ., the conviction is not stale and it is relevant to show . . . the whole person." Because the impeachment conviction occurred approximately five months before Mickelson's trial, the district court did not abuse its discretion by finding that this factor weighs in favor of admission.

*Similarity of past crime with charged crime*

"The more similar the alleged offense and the crime underlying a past conviction, the more likely it is that the conviction is more prejudicial than probative." *Swanson*, 707 N.W.2d at 655. The impeachment conviction was second-degree burglary. One of the crimes that the state charged in this case was first-degree burglary. The district court

9

determined "that the use of the word burglary in each charge is too close and too prejudicial and so I am going to order . . . it will be an unspecified felony."

The Minnesota Supreme Court has held that Minn. R. Evid. 609(a) allows a party to impeach a witness with unspecified felony convictions. *Hill*, 801 N.W.2d at 652. The decision about whether to disclose the details of the impeachment conviction "remains within the sound discretion of the district court." *Id.* Mickelson takes issue with the fact that the district court allowed the state to impeach him with an unspecified felony if he had chosen to testify, arguing that "[t]he purpose of allowing the prosecutor to impeach only with an unspecified felony should not be to make an end-run around" the *Jones* factors. But, the district court did not bypass the *Jones* factors by summarily allowing the state to use an unspecified felony for impeachment. Rather, the district court carefully considered the fact that the similarity of the impeachment conviction to one of the charges against Mickelson could result in unfair prejudice against Mickelson in determining that the *Jones* factors favored admission of the conviction for impeachment. The district court was well within its discretion to allow the impeachment conviction to be introduced as an unspecified felony.

*Importance of defendant's testimony and centrality of credibility*

The fourth and fifth *Jones* factors are often analyzed together. *See Swanson*, 707 N.W.2d at 655–56 (evaluating fourth and fifth *Jones* factors together); *State v. Gassler*, 505 N.W.2d 62, 67 (Minn. 1993) (same). "If credibility is a central issue in the case, the fourth and fifth *Jones* factors weigh in favor of admission of the prior convictions."

10

*Swanson*, 707 N.W.2d at 655. The district court acknowledged that "it is always important to give the defendant an opportunity, if the defendant chooses to do so, to testify in a case." The district court determined that credibility was not as central in this case as others because the state had circumstantial physical evidence, which took the case out of the realm of being a "classic he said/she said type of case." Although the physical evidence may have taken this case out of the realm of being a typical he said/she said case, Mickelson's credibility would have been central if he had testified because the jury would have had to weigh his credibility against P.B.'s. The district court therefore did not abuse its discretion with respect to the fourth and fifth *Jones* factors.

After weighing all five *Jones* factors, the district court ruled that evidence of an unspecified felony conviction could be used to impeach Mickelson if he chose to testify. Because the district court carefully considered the *Jones* factors and because, on balance, they favor admission of Mickelson's prior conviction for impeachment, the district court did not clearly abuse its discretion.

**IV.**

Mickelson argues that the district court erred by failing to suppress P.B.'s in-court identification of him because the in-court identification violated his right to due process. Mickelson argues that because P.B. could not identify him in the photographic lineup, "any subsequent in-court identification would be irreparably tainted." Mickelson argues that when P.B. viewed him seated at counsel table during trial, her memory "would have been unfairly jogged by having seen his photo in the lineup."

11

"A claim of a due process violation depends on the totality of the circumstances surrounding the confrontation." *State v. Harris*, 405 N.W.2d 224, 230 (Minn. 1987) (alteration omitted) (quotation omitted). We must determine whether the in-court identification here was so impermissibly suggestive that it created a substantial likelihood of irreparable misidentification. *See id.* at 229.

The district court determined that the pretrial photographic lineup was not unnecessarily suggestive. We agree. P.B. did not make an identification during the lineup.[1] Therefore, the pretrial photographic lineup did not affect P.B.'s in-court identification because she had an "adequate independent origin" for her identification. *See State v. Ostrem*, 535 N.W.2d 916, 921 (Minn. 1995). She testified that the light emanating from the television was sufficient for her to see Mickelson in the apartment and that she could not identify Mickelson in the photographic lineup because she needed to see a side profile view of him. P.B.'s in-court identification was essentially an issue of credibility, which is exclusively the province of the jury. *See, e.g.*, *State v. Pippitt*, 645 N.W.2d 87, 94 (Minn. 2002). In addition to hearing P.B.'s in-court identification, the jury heard evidence that P.B. failed to identify Mickelson in the photographic lineup. The jury evidently believed her in-court identification, and we must defer to that determination. The fact that Mickelson was the only African American male in the courtroom also did not render the

---

[1] Mickelson himself writes in his pro se brief, "[W]hen looking at the photos, I noticed that I am significantly darker than the others. None of my facial features show in a black [and] white picture, but you can see theirs." Mickelson's own observation is further evidence that the photographic lineup was not unnecessarily suggestive. If P.B. had identified Mickelson's photograph when it was difficult to distinguish his facial features due to the dark lighting, her identification likely would have been called into question.

12

in-court identification impermissibly suggestive. *See Harris*, 405 N.W.2d at 229–30 (concluding that in-court identification did not violate defendant's right to due process when witness "saw the defendant in the courtroom where he was the only black man present and clearly the one on trial"). Because the circumstances surrounding P.B.'s in-court identification were not impermissibly suggestive as to create a substantial likelihood of irreparable misidentification, Mickelson's due process rights were not violated.

## V.

In his pro se supplemental brief, Mickelson contends that Sergeant Wente did not follow the proper procedures when conducting the photographic lineup with P.B. Other than his assertions, he provides no argument or citation to authority. This issue is therefore waived. *See State v. Bartylla*, 755 N.W.2d 8, 22 (Minn. 2008) ("[Appellate courts] will not consider pro se claims on appeal that are unsupported by either arguments or citations to legal authority."). Furthermore, as discussed above, we have concluded that the photographic lineup was not unnecessarily suggestive.

Mickelson also alleges inconsistencies in P.B.'s testimony, arguing that he does not "understand how her story can be looked at as concrete." Mickelson is essentially arguing that P.B. was not a credible witness. But, "weighing the credibility of witnesses is a function exclusively for the jury." *Pippitt*, 645 N.W.2d at 94. We therefore defer to the jury's judgment of P.B.'s credibility.

**Affirmed.**

13