*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2016).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0267**

State of Minnesota,
Respondent,

vs.

Randy Columbus Jones,
Appellant.

**Filed February 6, 2017
Affirmed
Peterson, Judge**

Dakota County District Court
File No. 19HA-CR-15-2262

Lori Swanson, Attorney General, St. Paul, Minnesota; and

James C. Backstrom, Dakota County Attorney, Heather D. Pipenhagen, Assistant County Attorney, Hastings, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Steven P. Russett, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Larkin, Presiding Judge; Peterson, Judge; and Hooten, Judge.

**U N P U B L I S H E D   O P I N I O N**

**PETERSON**, Judge

In this appeal from a terroristic-threats conviction, appellant argues that the prosecutor committed misconduct by (1) eliciting irrelevant and prejudicial testimony,

(2) commenting on that testimony during closing argument, and (3) attacking appellant's character during closing argument; and that the collective misconduct led to jury bias that deprived him of a fair trial. We affirm.

**FACTS**

In early 2015, M.M. began a long-distance online relationship with appellant Randy Columbus Jones, and in May 2015, Jones moved to Minnesota and began living with M.M. and her 16-year-old daughter, D.M. According to M.M.'s trial testimony, soon after Jones moved in with her, she began to have doubts about the relationship. She "started catching [Jones] in little lies," he wanted her to buy him things like a phone and a truck, and he told her that she "need[ed] to do better" when he asked her to wash his work clothes at 1:00 a.m.

M.M. testified that by the Fourth of July weekend, she knew that "it was time to try to get him out." That weekend, M.M. saw a text message that Jones sent, which stated that he could not talk at the time because he was hosting a big pool party at his house. When she confronted Jones about this lie and told him that she was going to sleep on the couch, "he grabbed [her] wrist and told [her that she] was not." After that weekend, their relationship was "[v]ery on edge." A few days later, on July 7, M.M. overheard Jones's son contact him via a video chat so that Jones "could watch him receive oral sex from some woman." The next day, when M.M. confronted him about this behavior, Jones laughed and explained that it was "just a son and father's relationship." M.M. concluded, "That was it."

2

On July 8, M.M. had Jones walk her out to her car when she went to work, and, after getting into her car, she told him that she did not think their relationship was going to work. In order to encourage him to move out, she told him that she might move in with her parents. M.M. testified that Jones "blew up and yelled at [her] and then stormed in the house." M.M. then went to work, and when she finished at 9:00 p.m., she picked up D.M. and took her out to eat. M.M. told D.M. that if anything happened when Jones returned from his job that night, D.M. should "not get involved[,] [j]ust call the police." M.M. sent text messages to friends expressing similar concerns for her own welfare.

Jones had used M.M.'s car to drive to his restaurant job on July 8, and he normally returned by 11:30 p.m. When M.M. woke up at 2:00 a.m. and Jones was not there, she tried calling and text messaging him. He did not respond, so she drove to the restaurant and discovered that her car was not there. She became worried that he might have stolen her car. Jones eventually returned home at 3:00 a.m., and M.M. asked him where he went with her car. M.M. testified that, at first, Jones ignored her, but when she turned over to go back to sleep, "[H]e ripped the covers off me, jumped on top of me on the bed, on his hands and knees right above me in my face, screaming and yelling. Pointing at me. Calling me all kinds of names." He also spit in her eye. According to M.M., she "was scared to death." M.M. testified, "He's big. He's on top of me. I can't do anything. I could smell alcohol on him. My daughter's in the other room." When she attempted to call 911, he took her phone. He threatened that if he had to leave, he was going to kill her, kill her parents and children, and burn the house down.

3

D.M. testified that she awoke to hear Jones yelling at her mother and making "threat[s] to kill my family, like me, my sister, my mom, my grandparents." She felt "scared that he was going to hurt [them]." D.M. called 911 at 3:21 a.m. and called a second time eight minutes later because "all of a sudden it was just silent[,] [s]o then [D.M.] thought he killed her or something." D.M. told the 911 operator that Jones said to her mother something like, "If you leave me, . . . I'm gonna f—k your whole s—t up . . . your mama, your dad, your daughters, everything."

M.M. testified that Jones continued to refuse to leave, but he returned her phone. When Jones went into the closet to get dressed, M.M. grabbed her purse, and she and D.M. left the house. According to both D.M. and M.M., as they were leaving the house, the police were walking up the driveway.

Jones was charged with felony-level terroristic threats in violation of Minn. Stat. § 609.713, subd. 1 (2014);[1] interference with an emergency call, a gross misdemeanor; and domestic assault, a misdemeanor. During trial, the state and the defense offered conflicting theories of the case that relied on the credibility of the main witnesses, Jones and M.M. In her opening statement, the prosecutor suggested that because of Jones's increasingly objectionable conduct, M.M. had decided that they should sever their relationship and that he should move out, which he adamantly opposed, and that Jones responded with assaultive conduct and terroristic threats when she finally insisted that he move out. Defense counsel argued that both M.M. and Jones wanted to end the relationship and described M.M.'s

---

[1] This offense is now referred to as "threats of violence." Minn. Stat. § 609.713, subd. 1 (2016).

4

actions on the morning of July 9 as those of an angry woman who "had a plan in place that if there was the slightest problem in ending this relationship at 3 o'clock in the morning, she would utilize the police to end that relationship."

Jones testified that he did not take M.M.'s phone or threaten M.M. or her family in any way, and he explained that M.M. was a jealous person and her jealousy caused problems in their relationship. He also testified that he had decided that "it was time . . . to move on" after the Fourth of July weekend and that on the night of July 8, he had gone out after work with coworkers and a woman with whom he had decided to start a new relationship. He stated that when he arrived home, M.M. was angry with him, and they got into an argument. He could not understand why he was arrested because he "had not done anything to anyone." Jones admitted that he had committed nine felonies during the past eight years.

One of the three officers who responded to the 911 call testified at trial that D.M. and M.M. were visibly upset as they left the house and that Jones refused to follow his commands and those of another officer to put his hands in the air and stop walking. The second officer testified that as she was transporting Jones to jail, he said that "if he would have known he was going to jail, he would have beat [M.M.] to the point of killing her." The jury also heard recordings of the two 911 calls, saw body-camera videos of the officers' initial interactions with M.M. and D.M., and heard a recording of the statement D.M. made to police soon after the offense.

5

During closing argument, defense counsel stated:

> Now, we've heard from [M.M.] She told us she wanted this relationship to end and she couldn't trust [Jones]. Okay. What was the example she gave to the police and gave to us about not being able to trust him? By and large it was this pool party . . . where, apparently, she came across a text where she said he was -- reported that he was hosting this party, and he wasn't the host, he was a guest. I can't believe a thing he says because he's saying he's hosting a party.

In response, the prosecutor argued:

> It wasn't just the pool party. That's not what set her off. She told you there were all kinds of little things she had picked up on. That was an example. In fact, remember what the last straw was the night before July 8th, July 7th. Him sitting there on the phone watching his son on FaceTime live having a woman perform oral sex on him. That was the last straw. Wasn't the pool party. The shine had worn off.

The prosecutor also argued that the jury should not "be conned by Mr. Jones, the always smiling Randy Jones," and that the "real Mr. Jones" was "[t]he angry Mr. Jones." Defense counsel did not object to any of the prosecutor's statements during closing argument.

The jury found Jones guilty of the terroristic-threats offense and not guilty of the other two charges. The district court imposed a 30-month sentence.

**D E C I S I O N**

At trial, appellant did not object to M.M.'s testimony about appellant watching his son during the video chat or to the prosecutor's statements during closing argument. "Failure to object to the admission of evidence generally constitutes a waiver of the right to appeal on that basis; however, [an appellate] court has discretion to consider an error not

6

objected to at trial if it is plain error that affects substantial rights." *State v. Martinez*, 725 N.W.2d 733, 738 (Minn. 2007). Generally,

> before an appellate court reviews an unobjected-to error, there must be (1) error; (2) that is plain; and (3) the error must affect substantial rights. If these three prongs are met, the appellate court then assesses whether it should address the error to ensure fairness and the integrity of the judicial proceedings.

*State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998) (footnote omitted). For unobjected-to prosecutorial misconduct, this court applies a modified plain-error test; once misconduct that "reaches the level of plain or obvious error" is established, the prosecution bears "the burden of demonstrating that its misconduct did not prejudice the defendant's substantial rights." *State v. Ramey*, 721 N.W.2d 294, 299-300 (Minn. 2006). If the state does not meet this burden, "the court then assesses whether the error should be addressed to ensure fairness and the integrity of the judicial proceedings." *Id.* at 302; *see also State v. Hill*, 801 N.W.2d 646, 654 (Minn. 2011) (explaining that, for prosecutorial-misconduct claims, a modified substantial-rights test is applied).

Appellant argues that the prosecutor committed misconduct by eliciting M.M.'s testimony about the video-chat incident because the evidence was irrelevant and had great potential to be used as character and propensity evidence. "[A]ttempting to elicit or actually eliciting clearly inadmissible evidence may constitute misconduct." *State v. Fields*, 730 N.W.2d 777, 782 (Minn. 2007) (footnote omitted). Relevant evidence is admissible at trial but "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Minn. R. Evid. 402, 403. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination

7

of the action more probable or less probable than it would be without the evidence." Minn. R. Evid. 401.

Appellant argues that the video-chat evidence was not relevant because M.M.'s specific reason for ending her relationship with appellant did not make it more or less probable that appellant threatened M.M. or interfered with an emergency telephone call, or, if he did, he did so with the requisite intent. But the video-chat evidence was not just evidence of M.M.'s specific reason for ending the relationship; it was evidence of why the break up between appellant and M.M. occurred.

The state claimed that M.M. initiated the break up, which appellant opposed, and appellant responded with assaultive conduct and threats. Appellant claimed that both he and M.M. wanted the relationship to end, and, although they argued, there was no assault or threat of violence. Whether M.M. initiated the break up, or the break up was a mutual decision between appellant and M.M., made it more or less probable that appellant would respond with assaultive conduct and threats. And the video-chat evidence made it more or less probable that M.M. initiated the break up. Thus, the video-chat evidence was relevant to the state's claim that M.M. initiated the break up.

But the video-chat evidence was also potentially prejudicial because it could have shocked the jury. In *State v. Diamond*, 308 Minn. 444, 449, 241 N.W.2d 95, 99 (1976), the supreme court rejected an argument that evidence of a defendant's homosexuality was so shocking to the jury that it denied the defendant a fair trial. The supreme court upheld the admission of the evidence, despite its potential prejudicial impact, because the jury was entitled to consider the evidence in determining the defendant's credibility. *Diamond*, 308

8

Minn. at 449, 241 N.W.2d at 99; *cf. State v. DeZeler*, 230 Minn. 39, 46-47, 41 N.W.2d 313, 319 (1950) (permitting admission of photographs into evidence at trial if relevant to a material issue, even though the photographs were vivid or shocking, or they "incidentally tend[ed] to arouse passion or prejudice").

The probative value of the video-chat evidence was not substantially outweighed by the danger of unfair prejudice. Although the evidence could have shocked the jury, the nature of the video-chat incident supported M.M.'s claim that she decided to end the relationship and she wanted appellant to move out. And the evidence did not suggest that appellant had any tendency to react violently or make threatening statements. Thus, the evidence was admissible at trial, and eliciting M.M.'s testimony about the video-chat incident was not misconduct. Also, because M.M.'s testimony was admissible, the prosecutor did not commit misconduct by referring to the testimony during closing argument to bolster the state's theory that M.M. initiated the breakup.

During closing argument, the prosecutor referred to appellant as having "conned" M.M. and as an "angry" man whose "real" or "true" personality was revealed in the video recordings made on the night when appellant was arrested. The prosecutor also referred to appellant's nine felony convictions. Appellant argues that these references were misconduct because they told the jury that appellant was an angry man who acted consistently with his character.

"[C]haracter attacks [are] improper during a prosecutor's closing argument." *State v. Washington*, 521 N.W.2d 35, 39 (Minn. 1994); *see State v. Sharich*, 297 Minn. 19, 23, 209 N.W.2d 907, 911 (1973) ("By voluntarily testifying in his own behalf, the accused

opens up only the issue of his credibility, not his general character."); *see also* Minn. R. Evid. 404(b) (generally ruling character evidence inadmissible to prove action in conformity therewith). But the prosecutor may "argue reasonable inferences from the facts presented at trial." *State v. Leake*, 699 N.W.2d 312, 327-28 (Minn. 2005) (rejecting plain-error claim based on prosecutor's arguments about objectification of women and stating that, while the arguments "could be interpreted as going beyond the mere facts," they were not prejudicial).

The prosecutor's statements were directly related to evidence presented at trial that pertained to appellant's credibility, which was an issue for the jury. Appellant's theory of the case was that the break up was mutual and, although he and M.M. argued, he did not assault or threaten her. Appellant testified that he could not understand why he was arrested because he had not done anything to anyone. The prosecutor did not argue that appellant was an angry man who acted consistently with his nature. She argued that the jury should rely on the evidence that showed that appellant was angry on the night he was arrested, rather than on appellant's demeanor in court and his testimony. The prosecutor's characterizations of appellant were reasonable inferences based on the evidence presented at trial.

Finally, appellant argues that the cumulative effect of admitting the video-chat evidence and the instances of prosecutorial misconduct deprived him of his constitutional right to a fair trial "by producing a biased jury." *State v. Davis*, 820 N.W.2d 525, 538 (Minn. 2012); *Hill*, 801 N.W.2d at 659. The supreme court has addressed this issue only "in rare cases . . . when the errors and indiscretions, none of which alone might have been

10

enough to tip the scales, operate to the defendant's prejudice by producing a biased jury."

*Davis*, 820 N.W.2d at 538 (quotation omitted). Because the video-chat evidence was properly admitted and the prosecutor did not commit misconduct, appellant has failed to show that he did not receive a fair trial.

**Affirmed**.