STATE of Minnesota, Respondent,

v.

Craig Matthew HOHENWALD,
Appellant.

No. A10–1986.

Supreme Court of Minnesota.

July 11, 2012.

Lori Swanson, Attorney General, John B. Galus, Assistant Attorney General, St. Paul, MN; and Amy K. Brosnahan, Kanabec County Attorney, Mora, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Michael F. Cromett, Assistant State Public Defender, St. Paul, MN, for appellant.

## OPINION

STRAS, Justice.

After the State filed a criminal complaint against appellant Craig Matthew Hohenwald charging him with four counts of second-degree murder, a grand jury indicted Hohenwald on two counts of first-degree premeditated murder, Minn.Stat. § 609.185(a)(1) (2010), two counts of first-degree felony murder, Minn.Stat. § 609.185(a)(3) (2010), and two counts of second-degree murder, Minn.Stat.

§ 609.19, subd. 1(1) (2010), while the criminal proceedings against him were suspended to assess his competency under Minn. R.Crim. P. 20.01. Following a bench trial, the district court convicted Hohenwald on both counts of first-degree premeditated murder. On appeal, Hohenwald challenges his convictions on four grounds. First, he asserts that the district court erred when it denied his motion to dismiss the indictment on the ground that the State conducted the grand jury proceedings in violation of Rule 20.01. Second, he claims that the record contains insufficient evidence to convict him of first-degree premeditated murder because the State failed to disprove beyond a reasonable doubt that he acted in the heat of passion. Third, he argues the prosecutor committed misconduct during witness questioning. Fourth, he contends the district court committed reversible error when it admitted a witness's out-of-court statement. We affirm Hohenwald's convictions.

## I.

Following a bench trial, the district court convicted Hohenwald of the first-degree premeditated murders of Larry and Lois Steenerson. The events in question occurred on February 8, 2009, at the Steenerson residence in Kanabec County, Minnesota. The killings apparently related to a dispute over farm property that the Steenersons had previously sold to the Hohenwald family. Eleven days before the murder, the Steenersons had obtained a preliminary attachment order against the farm in connection with a lawsuit alleging that the Hohenwalds had defaulted on various notes and mortgages relating to the sale. Although the Steenersons did not personally name Hohenwald as a defendant in the lawsuit, Hohenwald's girlfriend testified that Hohenwald was "irritated" that someone was trying to take the farm away from his family. In fact, Hohenwald admitted to his girlfriend that he consumed alcohol on the day of the murder "because of the stress of the family farm and everything."

On the day in question, Hohenwald contacted J.S., a woman with whom he had previously spent time on a few occasions. Hohenwald sent J.S. text messages asking if she was up for a crazy night and discussing "10 Gs," a reference that J.S. thought related to the use of illicit drugs. After the exchange of text messages, J.S. picked up Hohenwald and began to drive to a house used for ice fishing. On the way, however, Hohenwald asked J.S. to stop at the Steenerson residence because he wanted to take care of "something going on with his family."

Hohenwald and J.S. arrived at the Steenerson residence at approximately 10:20 p.m. J.S. parked her car in front of the Steenersons' garage. At first, both Hohenwald and J.S. got out of the car, but J.S. testified that Hohenwald told her to return to the car. J.S. denied entering the Steenerson residence, claiming instead that she listened to music and played with her cell phone after returning to the car.

At 10:26 p.m., the Kanabec County Sheriff's Department received the first in a series of 911 calls from the Steenerson residence. The first three calls disconnected before the caller spoke. Approximately twenty-five seconds after the first call, a fourth 911 call was made in which Lois Steenerson stated that "somebody's robbing us, they've shot, there's guns out here." The 911 dispatcher advised Lois to go somewhere safe, but she replied, "I can't, he, he stabbed me," and then the telephone call disconnected. When the dispatcher reestablished the 911 call about two minutes later, Larry Steenerson answered, "They're trying to kill us here Craig, Craig Hohenwald." The dispatcher

then heard three loud yells and the sounds of a struggle, glass breaking, and a door shutting. At that point, a deputy who responded to the 911 calls pulled into the driveway of the Steenerson residence. The deputy saw Hohenwald run from the house and enter the passenger side of J.S.'s car.

When Hohenwald entered J.S.'s car, he said "let's go." J.S. placed the car in reverse and was about to head down the driveway when she spotted the deputy's squad car approaching. After the deputy arrived, he ordered both J.S. and Hohenwald to get out of the car and lie down on the ground. The deputy observed blood all over Hohenwald's arms and head and witnessed Hohenwald removing a pair of leather gloves soaked in blood.

Inside the house, officers found Larry Steenerson's body in a basement office. An emergency medical technician pronounced Larry dead at the scene. A medical examiner later determined that Larry suffered 28 sharp force wounds to his body, including stab wounds to his left jugular vein, his esophagus, and his upper left chest and lung. The medical examiner also found multiple blunt force injuries and abrasions on Larry's body. Officers found Lois Steenerson covered in blood and taking shallow breaths in an upstairs bedroom. Lois was pronounced dead shortly after arriving at a nearby hospital. Lois's autopsy showed that she suffered eight sharp force wounds, including stab wounds to her left jugular vein and upper back. The medical examiner concluded that both Larry and Lois died from exsanguination (loss of blood), and that the manner of death for both was homicide.

At the scene, officers recovered a wooden-handled knife several yards behind J.S.'s car. Officers also found a blood-stained, black-handled knife, with its blade bent at a 50–degree angle, in a doorway

adjacent to the basement office where officers found Larry's body. Inside the basement office, there was a knife scabbard on the floor and a significant amount of blood on and in front of a roll-top desk. In the family room (across from the basement office), officers recovered a broken spotlight covered with Larry's hair and blood. In a wall at the top of the stairs leading from the basement to the entryway of the residence, officers discovered a bullet hole, the angle of which indicated that someone had fired a bullet at an upward trajectory toward the entryway. Officers also retrieved an empty .22 revolver in a hamper outside of the upstairs bedroom and a .357 revolver under the passenger seat of J.S.'s car. The parties later stipulated at trial that Larry Steenerson had purchased, and presumably still owned, both guns.

DNA testing of the blood recovered from the scene of the murder showed Larry Steenerson's blood on both knives, on the grip of the .357 revolver, on the passenger side of J.S.'s car, and on Hohenwald's clothes and body. There were also stains of Larry's blood in the office, the family room, the stairwell, and on the door handle to the upstairs bedroom. Lois Steenerson's blood was not found on either of the two knives, nor was blood from either victim found on J.S.'s clothes or the driver's side of J.S.'s car.

Hohenwald testified to the following facts at trial. Hohenwald decided to stop by the Steenerson residence on February 8, 2009, to "see if we could work something out." After entering the Steenerson residence with J.S., Hohenwald began a discussion with Larry. Although Hohenwald may have sworn at Larry during the conversation, he did not shout at him. The two of them spoke for a few minutes and then Larry stated that he needed to retrieve something from downstairs. Shortly thereafter, Larry returned with a gun

and shot at Hohenwald. Hohenwald then grabbed for the gun and the two men struggled with one another, eventually falling down the stairs. At some point, Hohenwald hit Larry with the spotlight in the family room, causing Larry to let go of the gun. Hohenwald then ran into the office, grabbed the black-handled knife from the desk, and stabbed Larry. After Hohenwald bent the knife from stabbing Larry, he threw it down and ran out of the house. Hohenwald denied ever seeing Lois Steenerson, stabbing her, or going into the upstairs portion of the house.

On cross-examination, the prosecutor asked Hohenwald why he did not retreat after Larry let go of the gun. Hohenwald responded, "I don't know. I was scared.... He just shot at me.... I don't know.... I wasn't thinking clearly." Hohenwald conceded, however, that he was upset, that he was angry at Larry, and that it "makes sense" that he wanted to "get" Larry for shooting at him. During his testimony, Hohenwald also admitted to writing a note discovered by jail personnel during a routine search of his jail cell. The note stated: "Fight Pushed down Ran up 4 Phone ran Back G Pointed fought crazy."

The district court, sitting as the finder of fact, found that Hohenwald intentionally killed both Larry and Lois Steenerson. The court based its conclusion on the number and location of the wounds on each of the victims. The court specifically rejected Hohenwald's testimony that he did not kill Lois Steenerson. With respect to premeditation, the court found that the 911 recording and Hohenwald's note showed that Hohenwald left each of the victims alone in the house for some appreciable amount of time. In addition, the court

noted that Hohenwald had a motive for killing the Steenersons: that he was "irritated and frustrated" by the lawsuit brought by the Steenersons against Hohenwald's family. Finally, the court found that the "nature of the attacks," including "the multiple stab wounds," provided further evidence of premeditation. Accordingly, the court concluded that Hohenwald killed Larry and Lois Steenerson intentionally and with premeditation.

Hohenwald argued at trial that he was guilty of, at most, heat-of-passion manslaughter, but the district court disagreed. The court did not credit Hohenwald's version of events, specifically rejecting the claim that Larry shot at him "out of the blue." The court also found that Hohenwald left Larry alone in the basement office, which permitted Larry to speak with the 911 dispatcher, and then later returned a second time to continue his attack. The court found that, during the interim period, Hohenwald climbed two flights of stairs, passed the front door, and then attacked Lois in an upstairs bedroom. Based on these facts, the court concluded that Hohenwald had not killed Larry or Lois Steenerson in the heat of passion.

Based on its findings, the district court convicted Hohenwald of two counts of first-degree premeditated murder.[1] The court then sentenced Hohenwald to a term of life imprisonment without the possibility of release on each of the convictions. This appeal followed.

## II.

■ The first question presented by Hohenwald's appeal is whether the district court erred in denying his motion to dismiss the indictment. *See* Minn. R.Crim. P.

---

1. The district court also found Hohenwald guilty of two counts of first-degree felony murder and two counts of second-degree intentional murder, but it imposed sentence on only the two convictions for first-degree premeditated murder.

17.06, subd. 2 (stating the grounds on which a defendant can challenge the validity of an indictment). Hohenwald claims that the district court was required to dismiss the indictment because the grand jury was convened, and indicted him, while the criminal proceedings against him were suspended pursuant to Minn. R.Crim. P. 20.01, subd. 3. A brief review of the relevant facts provides context for Hohenwald's claim.

Initially, the State filed a criminal complaint against Hohenwald, alleging four counts of second-degree murder arising out of the deaths of Larry and Lois Steenerson. Prior to trial, however, Hohenwald's counsel filed a motion seeking an evaluation of Hohenwald's mental competency in accordance with Minn. R.Crim. P. 20.01. *See* Minn. R.Crim. P. 20.01, subd. 3 (providing that, if defense counsel has reason to doubt the defendant's competency, counsel should raise the issue by motion). The court granted counsel's motion and appointed Dr. Harlan Gilbertson to conduct the examination. In the order granting the motion, the court also declared: "[f]urther proceedings in [this] file are suspended as specified by Rule 20.01."

Two days later, the State petitioned the district court for an order convening a grand jury. The district court granted the State's petition. After hearing the testimony of various witnesses, the grand jury returned an indictment against Hohenwald containing four counts of first-degree murder and two counts of second-degree murder arising out of the deaths of Larry and Lois Steenerson. The indictment was filed under the same case number as that assigned to the pending criminal complaint against Hohenwald.

Dr. Gilbertson submitted his Rule 20.01 report to the district court on the same day the grand jury returned its indictment, but the court did not rule that Ho-henwald was competent to stand trial until approximately one month later. At that time, the court vacated its earlier suspension of the criminal proceedings and arraigned Hohenwald on the indictment. Hohenwald's counsel moved to dismiss the indictment, asserting that the grand jury's consideration of the evidence regarding the death of Larry and Lois Steenerson contravened "the mandate of Rule 20.01 and the court's order [suspending the criminal proceedings]."

The district court denied Hohenwald's motion to dismiss the indictment. The district court explained: "[t]he autonomy of the grand jury and the absence of participation both by the court and the defendant indicate that summoning the grand jury is an entirely new proceeding, independent of any prior charges made by complaint." Accordingly, the district court concluded that "the 'criminal proceedings' that were suspended by [Hohenwald's] Rule 20 examination [were] only those proceedings under the written complaint filed February 10, 2009."

▪ On appeal, Hohenwald argues that the district court erroneously interpreted Rule 20.01, subdivision 3, because the grand jury proceeding in this case was part of "the criminal proceedings" contemplated by the Rule. Hohenwald's argument requires us to interpret the Minnesota Rules of Criminal Procedure, which presents a legal question that we review de novo. *State v. Dahlin,* 753 N.W.2d 300, 305 (Minn.2008). We interpret court rules in accordance with the rules of grammar and give words and phrases their common and approved usage. *See id.* at 306. When the language of a procedural rule is plain and unambiguous, we must interpret the rule in accordance with its plain language. *See id.* at 305.

According to Rule 20.01, subdivision 3, "[i]f the court determines that reason exists to doubt the defendant's competency, the court must suspend the criminal proceedings." Here, there is no dispute that the court had reason to doubt Hohenwald's competency when Hohenwald's counsel moved for a Rule 20.01 examination. Nor is there any question that the district court suspended the criminal proceedings when it granted counsel's motion for an examination. The only question, therefore, is whether the phrase "the criminal proceedings" is sufficiently broad to encompass the subsequent grand jury proceeding in this case.

The word "proceedings" generally refers to "the course of procedure in a judicial action or in a suit in litigation," not *any* litigation involving a particular person or party. *Webster's Third New International Dictionary of the English Language Unabridged* 1807 (2002); *The American Heritage Dictionary of the English Language* 1404 (5th ed.2011) ("often **proceedings** Legal action; litigation"). Thus, while Rule 20.01, subd. 3, uses the plural noun "proceedings" to designate what must be suspended by a court, the use of that word is read most reasonably as referring to the multiple, progressive hearings within a "particular action at law or case in litigation." *Webster's Third New International Dictionary of the English Language Unabridged* 1807. Indeed, "[i]n reference to the business done by a tribunal of any kind, the proceeding and the proceedings are interchangeable" words used to describe the course of litigation. Bryan A. Garner, *A Dictionary of Modern Legal Usage* 714 (3d ed.2011).[2] In the context of Rule 20.01, therefore, the "proceedings" or "particular action at law" covered by the Rule is the case in which a suspension order is entered.

The use of the word "the" before "criminal proceedings" in Rule 20.01 provides further evidence that the suspension order entered by the district court affected only the case already initiated against Hohenwald by criminal complaint. The definite article "the" is a word of limitation that indicates a reference to a specific object. *See Clark v. Ritchie*, 787 N.W.2d 142, 149 (Minn.2010); *see also Am. Bus. Ass'n v. Slater*, 231 F.3d 1, 4–5 (D.C.Cir.2000) ("[I]t is a rule of law well established that the definite article 'the' particularizes the subject which it precedes."); *The American Heritage Dictionary* 1803 (5th ed.2011) (stating that "the" is "[u]sed before singular or plural nouns and noun phrases that denote particular, specified persons or things"). Applying the word "the" as a word of limitation, Rule 20.01 requires the suspension of the proceedings in the then-existing case in which the court orders the suspension, not in an unspecified or indefinite number of cases. *See Slater*, 231 F.3d at 5 (stating that "the" is a word of limitation, not a word of indefinite or generalizing force). Indeed, if the drafters of the criminal rules intended to suspend all pro-

---

**2.** To be sure, Black's Law Dictionary defines the word "proceeding" (singular) as "[t]he regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment." *Black's Law Dictionary* 1324 (9th ed.2009). But we disagree with Hohenwald's argument that the plain meaning of the term "proceedings" (plural) in Rule 20.01 must necessarily refer to all lawsuits between the same parties. First, Hohenwald's argument discounts the fact that the "proceeding" and the "proceedings" are used interchangeably to describe the work done by courts, so the use of the plural form of "proceeding" in Rule 20.01 does not have the significance that Hohenwald would ascribe to it. Second, Hohenwald's argument ignores the surrounding text of Rule 20.01, which makes clear that the Rule refers to the multiple, progressive hearings within a single lawsuit. *See infra.*

ceedings brought against a particular criminal defendant, including those not yet in existence, they could have easily used words to that effect by suspending "all criminal proceedings" or "any criminal proceedings." Thus, the most natural reading of Rule 20.01 is that it requires district courts to suspend the proceedings in only the particular case in which it orders the suspension, not in all prospective actions that could possibly arise during the period of suspension.

Other subdivisions of Rule 20.01 confirm our interpretation. *See Dahlin,* 753 N.W.2d at 306 (stating that a procedural rule must be read as a whole and must be interpreted " 'in light of surrounding sections to avoid conflicting interpretations' "). For example, the procedures the district court must follow under Rule 20.01 after ordering a suspension depend on the type of case suspended. *See* Minn. R.Crim. P. 20.01, subd. 3 ("If the court determines that reason exists to doubt the defendant's competency, the court must suspend the criminal proceedings and proceed as follows. (a) In misdemeanor cases . . . ."). Similarly, subdivision 6 of Rule 20.01 connects the phrase "the criminal proceedings" to the charges upon which the defendant is *then* being tried. *See* Minn. R.Crim. P. 20.01, subd. 6(b) ("If the court finds the defendant incompetent, and the charge is a felony or gross misdemeanor, the proceedings must be suspended . . . ."). Reading Rule 20.01 as a whole, as we must, therefore supports the conclusion that it requires the suspension of only those proceedings that are part of the same case in which the district court has ordered suspension. It does not require

suspension of criminal actions that may not yet be in existence or are not part of the criminal case in which the suspension order was entered.

 Applying the foregoing interpretation of Rule 20.01 to the facts of this case, the district court's order suspending the proceedings in the case initiated against Hohenwald by criminal complaint had no effect on the commencement of the grand jury proceeding against him. The purpose of a grand jury is to "stand between the prosecutor and the accused" and to determine whether credible evidence supports a criminal charge. *State v. Iosue,* 220 Minn. 283, 293, 19 N.W.2d 735, 740 (1945) (quoting *Hale v. Henkel,* 201 U.S. 43, 59, 26 S.Ct. 370, 50 L.Ed. 652 (1906)). Grand jury proceedings are thus not a continuation of an existing criminal case, but are instead an independent process for bringing new and separate criminal charges against a defendant. *See State v. Dwire,* 409 N.W.2d 498, 502 (Minn. 1987) (describing an indictment and a complaint as separate, alternative means of prosecuting defendants); *accord People v. Carrington,* 47 Cal.4th 145, 97 Cal.Rptr.3d 117, 211 P.3d 617, 647 (2009) ("An indictment and an information initiate 'separate proceedings.' "); *State v. Thomas,* 625 S.W.2d 115, 125 (Mo.1981) ("The second indictment began a new and separate criminal proceeding . . . .").[3]

In fact, the circumstances of this case illustrate the independent nature of the grand jury as a separate charging body. Under Rule 17.01, only a grand jury indictment could have charged Hohenwald with first-degree murder because a conviction

---

3. *State v. Pettee,* 538 N.W.2d 126 (Minn.1995), is not to the contrary. To be sure, we stated in *Pettee* that an indictment for first-degree murder *"effectively* amended" the prior complaint. *See id.* at 131 (emphasis added). But we also recognized that an indictment results

in additional, independent charges against the defendant, and it is common for the State to voluntarily dismiss the complaint after successfully indicting the defendant on the additional charges. *See id.* at 131 n. 5.

for that offense is punishable by life imprisonment. Minn. R.Crim. P. 17.01, subd. 1 ("An offense punishable by life imprisonment *must* be prosecuted by indictment.") (emphasis added); *see also State v. Kivimaki,* 345 N.W.2d 759, 763 (Minn.1984) (recognizing that Rule 17.01 required an indictment to proceed on charges of first-degree murder). The indictment, therefore, necessarily commenced a new action against Hohenwald because, of the six counts returned against Hohenwald by the grand jury, the State could not have brought four of them in its criminal complaint.

Accordingly, we conclude that the district court did not err in denying Hohenwald's motion for dismissal of the indictment.[4]

### III.

■ The second question presented by Hohenwald's appeal is whether the State presented sufficient evidence to support the district court's verdict that Hohenwald is guilty of first-degree premeditated murder rather than heat-of-passion manslaughter. When considering a claim of insufficient evidence, we conduct "a painstaking review of the record to determine whether the evidence and reasonable inferences drawn therefrom, viewed in a light most favorable to the verdict, were sufficient to allow the jury to reach its verdict." *Staunton v. State,* 784 N.W.2d 289, 297 (Minn.2010) (citation omitted) (internal quotation marks omitted). In conducting

that review, we assume the factfinder believed the State's witnesses and disbelieved any evidence to the contrary. *State v. Moore,* 438 N.W.2d 101, 108 (Minn. 1989).

■ In this case, the State relied on circumstantial evidence to disprove Hohenwald's claim that he acted in the heat of passion when he killed Larry and Lois Steenerson. A conviction supported by circumstantial evidence requires us to conduct a two-step analysis:

> First, we must identify the circumstances proved, giving deference to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State. Second, we independently examine the reasonableness of all inferences that might be drawn from the circumstances proved, including inferences consistent with a hypothesis other than guilt. Thus, our review consists of determining whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt.

*State v. Anderson,* 789 N.W.2d 227, 241–42 (Minn.2010) (citing *State v. Andersen,* 784 N.W.2d 320, 329–30 (Minn.2010)) (internal quotation marks omitted). Applying that standard here, we must determine whether the circumstances proved by the State were consistent with the district court's verdict that Hohenwald was guilty of first-degree premeditated murder and inconsis-

---

4. Hohenwald further argues that the district court erred in denying his motion to dismiss the indictment because the grand jury proceedings independently violated the district court's June 23, 2009, order suspending the proceedings. Although the district court did say it was suspending "further proceedings in the above captioned file," and the court clerk later filed the indictment under the same file number referenced in the court's order, the

court's order does not provide a separate basis for dismissal of the indictment. The district court stated only that the proceedings were suspended *"as specified by Rule 20.01."* Given the qualifying language in the order, the district court did not suspend any proceedings *beyond* what Rule 20.01 requires. And as we explain above, Rule 20.01 requires suspension of only those proceedings based on the State's complaint.

tent with the hypothesis that Hohenwald acted in the heat of passion when committing the killings.

 A person who "intentionally causes the death of another person in the heat of passion provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances" is guilty of manslaughter in the first degree. Minn.Stat. § 609.20 (2010). Thus, a defendant is guilty of heat-of-passion manslaughter—which can mitigate first-degree premeditated murder—if (1) the killing was committed in the heat of passion, and (2) the defendant's passion was provoked by such words or acts of another that a person of ordinary self-control would have been provoked under the circumstances. *State v. Quick,* 659 N.W.2d 701, 711 (Minn.2003); *State v. Bradford,* 618 N.W.2d 782, 800 (Minn. 2000). The first element requires a defendant to have subjectively acted in the heat of passion at the time of the killing—that is, the heat of passion must have clouded a defendant's reason and weakened his willpower at the time of the offense. *State v. Van Keuren,* 759 N.W.2d 36, 40 (Minn. 2008); *State v. Carney,* 649 N.W.2d 455, 461 (Minn.2002). In deciding whether a defendant subjectively acted in the heat of passion, we consider the defendant's behavior before, during, and after the crime, but it is "the defendant's emotional state *at the time of the killing* [that] is of primary importance." *State v. Johnson,* 719 N.W.2d 619, 626–27 (Minn.2006).

 The first step in applying the circumstantial evidence standard is to review the circumstances proved by the State. In this case, Hohenwald admitted at trial that he was upset and angry with Larry, and that it "ma[de] sense" that he wanted to "get" Larry. Hohenwald further admitted that, after he dazed Larry with the spotlight and gained control of the gun, he ran into an adjacent room, retrieved the black-handled knife from the office desk, and stabbed Larry. Officers found Larry's blood in both the family room and office. Officers also found Lois's body in the upstairs bedroom and the door to the upstairs bedroom forced open. The 911 tapes indicated that Lois and Larry alternately spoke to the 911 dispatcher over an approximately five-minute period. Testimony at trial further established that Hohenwald was in the Steenerson residence for approximately 10 to 15 minutes, and upon leaving the house, Hohenwald ran to the car and told J.S., "let's go." Finally, the note written by Hohenwald and recovered from his jail cell stated: "Fight Pushed down Ran up 4 Phone ran Back G Pointed fought crazy."

Applying the second step, the circumstances proved lead to only one reasonable conclusion in this case: that Hohenwald is guilty of first-degree premeditated murder and that he did not act in the heat of passion while killing Larry and Lois Steenerson. Specifically, the reasonable inferences to be drawn from the circumstances proved are that, after Hohenwald stabbed Larry with the black-handled knife, Hohenwald realized that somebody upstairs was talking on the telephone. The note and the evidence indicate that Hohenwald then ran upstairs, forced open the upstairs bedroom door, and stabbed Lois repeatedly. Hohenwald then returned to the basement and continued his attack on Larry, eventually retrieving the wooden-handled knife after damaging the black-handled knife. When Hohenwald finally left the Steenerson residence, he was concerned only with escaping, as evidenced by the fact he told J.S., "let's go," when he reached the car.

These reasonable inferences indicate that Hohenwald engaged in calculated decision-making fueled by anger, not terror.

*See Van Keuren,* 759 N.W.2d at 40 (stating that anger alone is insufficient to form the basis for heat-of-passion manslaughter); *State v. Richardson,* 393 N.W.2d 657, 664 (Minn.1986) (holding that a defendant's decision to chase the victim and continue his attack "indicates hate instead of terror"). Thus, the circumstances proved support reasonable inferences that establish beyond a reasonable doubt that Hohenwald's reason and willpower were neither clouded nor weakened at the time of the killings. *Cf. State v. Stewart,* 624 N.W.2d 585, 591 (Minn.2001) (concluding that the defendant did not act in the heat of passion when he made "rational" and "calculating" attempts to avoid detection for the crime he had just committed).

Nonetheless, Hohenwald claims that the circumstances proved support a rational hypothesis that he "acted in a chaotic frenzy of extreme emotional upset" during the short period in which the killings occurred. We disagree. Hohenwald's claim is unreasonable in light of the fact that the killings occurred over at least a five-minute period in at least three rooms of the Steenerson residence, including the upstairs bedroom, the basement office, and the basement family room. Moreover, Hohenwald's alternate hypothesis is inconsistent with his admission in the note that he "Ran up 4 [the] Phone" and later "ran Back" downstairs to continue the fight. These admissions and the other evidence presented at trial prove that Hohenwald was thinking and acting in a calculated manner; they are inconsistent with Hohenwald's claim that his reason was clouded. Because the circumstances proved are consistent with the district court's verdict that Hohenwald's reason and willpower were neither clouded nor weakened at the time of the

killings and inconsistent with any other rational hypothesis, we conclude that the State presented sufficient evidence to prove that Hohenwald was guilty of first-degree premeditated murder rather than heat-of-passion manslaughter.[5]

## IV.

The third question presented by Hohenwald's appeal is whether the prosecutor committed misconduct during witness questioning. Hohenwald argues that the prosecutor's questioning resulted in two errors, although he concedes that he did not object to either error at trial. First, Hohenwald contends the prosecutor improperly elicited testimony from a deputy that Hohenwald was given a *Miranda* warning. Second, Hohenwald asserts the prosecutor improperly cross-examined him about statements he made during the Rule 20 examination.

 "When a defendant fails to object to an alleged error at trial, we review for plain error." *State v. Hill,* 801 N.W.2d 646, 654 (Minn.2011). In applying plain-error review, we will reverse only if (1) there is error, (2) the error is plain, and (3) the error affects substantial rights. *See id.* If the first three prongs of plain-error review are satisfied, we then assess "whether [we] should address the error to ensure fairness and the integrity of the judicial proceedings." *Id.* (quoting *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998) (internal quotation marks omitted)). For claims involving prosecutorial misconduct, we apply a modified substantial-rights inquiry. *See id.* For such claims, the State bears the burden of showing "that there is no reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict."

---

**5.** Because the State presented sufficient evidence that Hohenwald did not commit the killings in the heat of passion, we need not

and do not address the question of whether Larry's words or actions objectively provoked Hohenwald.

*Id.* (quoting *State v. Ramey,* 721 N.W.2d 294, 302 (Minn.2006) (internal quotation marks omitted)). When considering whether an error had a significant effect on the verdict, we consider "the strength of the evidence against the defendant, the pervasiveness of the improper suggestions, and whether the defendant had an opportunity to (or made efforts to) rebut the improper suggestions." *State v. Davis,* 735 N.W.2d 674, 682 (Minn.2007).

■ In this case, the State has satisfied its burden of showing that there is no reasonable likelihood that the absence of the misconduct would have had a significant effect on the verdict. As discussed above, the record contains strong evidence of Hohenwald's guilt of the first-degree premeditated murders of Larry and Lois Steenerson. In addition, the prosecutor did not reference the *Miranda* warning or the Rule 20 statements in questioning other witnesses or during closing argument. Indeed, the prosecutor's questioning about the *Miranda* warning and Hohenwald's Rule 20 statements together constituted less than two pages in a more than 1,000–page trial transcript. Moreover, the district court's findings after the bench trial do not reference the alleged Rule 20 statements and include only a brief historical reference to the *Miranda* warning in describing the collection of Hohenwald's blood-covered clothing. In short, the alleged misconduct did not affect Hohenwald's substantial rights. Because the alleged errors in witness questioning did not affect Hohenwald's substantial rights, we need not and do not consider the remaining prongs of the plain-error test.

## V.

The fourth question presented by Hohenwald's appeal is whether the district court abused its discretion when it allowed a deputy to testify that J.S. stated at the scene that Hohenwald asked J.S. for a ride to the Steenerson residence "to collect some money." Specifically, Hohenwald argues that the statement was inadmissible hearsay because it did not constitute a prior consistent statement by J.S. under Minn. R. Evid. 801(d)(1)(B). And the statement was prejudicial, according to Hohenwald, because it improperly established Hohenwald's motive for the killings through inadmissible testimony.

■ A defendant claiming he is entitled to a new trial because the district court abused its discretion in admitting evidence over his objection must show both an error and prejudice resulting from the error. *See State v. Loebach,* 310 N.W.2d 58, 64 (Minn.1981). When an evidentiary error does not rise to the level of a constitutional violation, as here, a defendant must show that the error substantially influenced the verdict in order to obtain a reversal of his convictions. *See State v. Jackson,* 770 N.W.2d 470, 482 (Minn.2009).

■ In this case, the allegedly erroneous admission of J.S.'s out-of-court statement did not substantially influence the district court's verdict. The deputy who testified about J.S.'s out-of-court statement made only a brief one-sentence reference to the statement in 21 pages of trial testimony. In addition, the deputy qualified her testimony about J.S.'s out-of-court statement with the phrase, "I believe," and when J.S. testified at trial, she denied making the statement. Moreover, the prosecutor did not refer to J.S.'s out-of-court statement during closing argument, and the record contains strong evidence of Hohenwald's guilt. And although the district court referred to J.S.'s out-of-court statement in its written findings, the court did not rely on the statement to find Hohenwald guilty of first-degree premeditated murder. Because the allegedly erroneous admission of J.S.'s out-of-court

statement did not substantially influence the verdict, we conclude Hohenwald is not entitled to a new trial.

## VI.

██ Finally, Hohenwald argues that he is entitled to a new trial because the cumulative effect of the alleged errors, even if they were individually insufficient to warrant a new trial, deprived him of his constitutional right to a fair trial. "Cumulative error exists when the 'cumulative effect of the * * * errors and indiscretions, none of which alone might have been enough to tip the scales, operate to the defendant's prejudice by producing a biased jury.'" *State v. Johnson,* 441 N.W.2d 460, 466 (Minn.1989) (alteration in original) (citing *United States v. Samango,* 607 F.2d 877, 884 (9th Cir.1979)). To the extent any errors occurred in this case, our careful review of the record convinces us that Hohenwald was not deprived of a fair trial.

## VII.

For the foregoing reasons, we conclude there is no reversible error in this case. Accordingly, we affirm Hohenwald's convictions for first-degree premeditated murder.

Affirmed.