5/21/2020 4:21:43 PM

# IN THE SUPREME COURT OF IOWA

No. 19–1402

Filed May 22, 2020

**JANE DOE,**

Plaintiff,

vs.

**STATE OF IOWA,**

Defendant.

---

Certiorari to the Iowa District Court for Polk County, William A. Price, District Associate Judge.

The petitioner seeks review of a district court order denying her application for expungement of the record of a dismissed criminal case. **WRIT SUSTAINED AND CASE REMANDED.**

Andrew Duffelmeyer (until withdrawal) and Robert J. Poggenklass (until withdrawal), and Alexander Vincent Kornya of Iowa Legal Aid, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Louis S. Sloven, Assistant Attorney General, and John P. Sarcone, County Attorney, for appellee.

**McDONALD, Justice.**

In 2011, Jane Doe was charged with one count of unauthorized use of a credit card. The charge was dismissed. In 2019, having satisfied all of her financial obligations in the dismissed case, Doe filed an application to expunge the criminal record pursuant to Iowa Code section 901C.2 (2019). The district court denied Doe's application on the ground Doe had had court-ordered financial obligations remaining in other cases and thus had not met the requisite condition set forth in section 901C.2(1)(*a*)(2). The question presented in this appeal is whether the district court erred in denying Doe's application for expungement on the ground Doe had court-ordered financial obligations in other cases. This is a question of statutory interpretation, and our review is for the correction of errors at law. *See State v. Doe*, 903 N.W.2d 347, 350 (Iowa 2017).

Before addressing the merits, we first address a jurisdictional issue. The State contends this court lacks jurisdiction over the case because an order denying an application for expungement is not appealable as a matter of right. *See* Iowa Code § 814.6(1). Doe responds that the district court acted illegally in denying her application and that this court may choose to treat her notice of appeal as a petition for writ of certiorari. *See* Iowa R. App. P. 6.107(1)(*a*) ("Any party claiming . . . an associate district court judge . . . acted illegally may commence an original certiorari action in the supreme court by filing a petition for writ of certiorari as provided in these rules."); *State v. Propps*, 897 N.W.2d 91, 97 (Iowa 2017) ("Additionally, if a case is initiated by a notice of appeal, but another form of review is proper, we may choose to proceed as though the proper form of review was requested by the defendant rather than dismiss the action."). We agree with Doe's response, and we choose to treat Doe's notice of appeal as a petition for writ of certiorari.

Turning to the merits of the case, in questions of statutory interpretation, "[w]e do not inquire what the legislature meant; we ask only what the statute means." Oliver Wendell Holmes, *The Theory of Legal Interpretation*, 12 Harv. L. Rev. 417, 419 (1899). This is necessarily a textual inquiry as only the text of a piece of legislation is enacted into law. Any interpretive inquiry thus begins with the language of the statute at issue. *See Doe*, 903 N.W.2d at 350. Using traditional interpretive tools, we seek to determine the ordinary and fair meaning of the statutory language at issue. *See State v. Davis*, 922 N.W.2d 326, 330 (Iowa 2019) ("We give words their ordinary meaning absent legislative definition."); *In re Marshall*, 805 N.W.2d 145, 158 (Iowa 2011) ("We should give the language of the statute its fair meaning, but should not extend its reach beyond its express terms."); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 33 (2012) [hereinafter Scalia & Garner, *Reading Law*] (defining "fair reading method" as "determining the application of a governing text to given facts on the basis of how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued"). In determining the ordinary and fair meaning of the statutory language at issue, we take into consideration the language's relationship to other provisions of the same statute and other provisions of related statutes. *See* Iowa Code § 4.1(38) ("Words and phrases shall be construed according to the context and the approved usage of the language . . . ."); *Doe*, 903 N.W.2d at 351 (stating we consider the "relevant language, read in the context of the entire statute"). If the "text of a statute is plain and its meaning clear, we will not search for a meaning beyond the express terms of the statute or resort to rules of construction." *In re Estate of Voss*, 553 N.W.2d 878, 880 (Iowa 1996); *see State v. Richardson,* 890 N.W.2d 609, 616 (Iowa 2017) ("If the

language is unambiguous, our inquiry stops there."). If the language of the statute is ambiguous or vague, we "may resort to other tools of statutory interpretation." *Doe*, 903 N.W.2d at 351.

We begin our inquiry in this case with the language of the statute as a whole. *See State v. Pettijohn*, 899 N.W.2d 1, 16 (Iowa 2017) ("Interpreting a statute requires us to assess it in its entirety to ensure our interpretation is harmonious with the statute as a whole rather than assessing isolated words or phrases."); *In re Estate of Melby*, 841 N.W.2d 867, 879 (Iowa 2014) ("When construing statutes, we assess not just isolated words and phrases, but statutes in their entirety . . . ."); Scalia & Garner, *Reading Law* at 167 ("Perhaps no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts.").

The statute requires the district court to expunge the record of a criminal case upon the defendant establishing five conditions have been satisfied. The statute provides,

> 1. *a.* Except as provided in paragraph "*b*", upon application of a defendant . . . in a criminal case . . . the court shall enter an order expunging the record of such criminal case if the court finds that the defendant has established that all of the following have occurred, as applicable:
>
> (1) The criminal case contains one or more criminal charges in which an acquittal was entered for all criminal charges, or in which all criminal charges were otherwise dismissed.
>
> (2) All court costs, fees, and other financial obligations ordered by the court or assessed by the clerk of the district court have been paid.
>
> (3) A minimum of one hundred eighty days have passed since entry of the judgment of acquittal or of the order dismissing the case relating to all criminal charges, unless the court finds good cause to waive this requirement for reasons

including but not limited to the fact that the defendant was the victim of identity theft or mistaken identity.

(4) The case was not dismissed due to the defendant being found not guilty by reason of insanity.

(5) The defendant was not found incompetent to stand trial in the case.

*b.* The court shall not enter an order expunging the record of a criminal case under paragraph "*a*" unless all the parties in the case have had time to object on the grounds that one or more of the relevant conditions in paragraph "*a*" have not been established.

Iowa Code § 901C.2.

When the statute is considered as a whole, it is apparent the statute is concerned with only the singular case for which expungement is sought. The application for expungement must be filed in "a criminal case"—singular. *Id.* § 901C.2(1)(*a*). The conditions prerequisite to expungement repeatedly refer to "the criminal case" or "the case." *Id.* § 901C.2(1)(*a*)(1), (3), (4), (5), .2(1)(*b*). The statute's use of the definite article "the" particularizes "the criminal case" and "the case." *See Nielsen v. Preap,* 586 U.S. ___, ___, 139 S. Ct. 954, 965 (2019) (stating "grammar and usage establish that 'the' is 'a function word . . . indicat[ing] that a following noun or noun equivalent is definite or has been previously specified by context.' " (alteration in original) (quoting Merriam-Webster's Collegiate Dictionary 1294 (11th ed. 2005))); *Am. Bus. Ass'n v. Slater,* 231 F.3d 1, 4–5 (D.C. Cir. 2000) ("[I]t is a rule of law well established that the definite article 'the' particularizes the subject which it precedes. It is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.' " (quoting *Brooks v. Zabka,* 450 P.2d 653, 655 (Colo. 1969) (en banc))); *State v. Hohenwald,* 815 N.W.2d 823, 830 (Minn. 2012) ("The definite article 'the' is a word of limitation that indicates a reference to a specific object."). "The criminal case" and "the case" thus must refer to a particular antecedent.

Here, the antecedent is the singular "criminal case" in which the application for expungement was filed and for which expungement was sought. *See* Iowa Code § 901C.2(1)(*a*).

The text of the subsection at issue also relates only to the record of the singular criminal case in which the application for expungement was filed and for which expungement was sought. The text provides the defendant must establish as a prerequisite to expungement that "[a]ll court costs, fees, and other financial obligations ordered by the court or assessed by the clerk of the district court have been paid." *Id.* § 901C.2(1)(*a*)(2). The State argues this provision is not limited to the singular case sought to be expunged because the provision does not specifically reference "the case" or the "criminal case." However, the State ignores other limiting language in the provision. Section 901C.2(1)(*a*)(2) uses the definite article "the" in limiting the financial obligations at issue to those "ordered by the court or assessed by the clerk of the district court." *Id.* Use of the definite article "the" means "the court" and "the clerk" have antecedents and must refer to a specific court or a specific clerk. *See Am. Bus. Ass'n*, 231 F.3d at 4–5; *Hohenwald*, 815 N.W.2d at 830. Here, those antecedents are the court that ordered the financial obligations or the clerk that assessed the obligations at a particular point in time in the past in "such criminal case." Iowa Code § 901C.2(1)(*a*)(2). "[S]uch criminal case" refers to the singular criminal case in which the application for expungement was filed.

An additional textual consideration shows the provision at issue refers only to the criminal case in which the application for expungement was filed. Iowa Code section 901C.3 provides a mechanism for the expungement of misdemeanor convictions. As a prerequisite to the expungement of a misdemeanor conviction, the Code provides the defendant must prove she "has paid all court costs, fees, fines, restitution,

and any other financial obligations ordered by the court or assessed by the clerk of the district court." *Id.* § 901C.3(1)(*d*). The misdemeanor expungement provision specifically identifies "fines" and "restitution" as amounts that must be satisfied as a prerequisite to the expungement of a misdemeanor conviction. Fines and restitution are financial obligations incurred only upon conviction. The absence of this language from the expungement provision in section 901C.2(1)(*a*)(2) strongly shows section 901C.2 addresses only the financial obligations due in the case in which the application for expungement was filed.

In addition to these textual considerations, we must also recognize the statute has the patina of prior judicial interpretation. In *Doe*, the defendant was charged with several aggravated misdemeanors in one trial information and a simple misdemeanor in a separate complaint with all charges arising out of the same operative facts. *See Doe*, 903 N.W.2d at 349. Pursuant to a plea agreement, the defendant in that case pleaded guilty to a lesser included offense of one count in the trial information, and the district court dismissed the remainder of the charges, including the separate simple misdemeanor. *See id.* Doe subsequently sought expungement of the record of the simple misdemeanor charge. *See id.* "The fighting issue . . . [was] the meaning of 'case' as used in Iowa Code section 901C.2. Is a case a particular numbered legal proceeding . . . or all the charges arising out of a single transaction or set of circumstances . . . ?" *Id.* at 351. We concluded "case," within the meaning of section 901C.2, referred to the particular case file with a separate case number for which expungement was sought. *See id.* at 355. *Doe*'s conclusion that "case" referred to a separate criminal file with a separate case number is consistent with our textual analysis that section 901C.2(1)(*a*)(2) refers to

the financial obligations only in the singular case in which the application for expungement was filed and for which expungement was sought.

The State resists the conclusion that section 901C.2(1)(*a*)(2) requires Doe to establish only that she has satisfied the financial obligations arising out of the singular case for which expungement was sought. In the State's view, the statute's use of "the court" and "the clerk" refer to the court or the clerk in the particular county in which the case was filed and thus the "plain meaning is that financial obligations arising from other cases in the same county would bar the expungement of any case files" in the county. In the State's view, this includes financial obligations in both criminal and civil cases. In the State's view, this interpretation advances the legislative purpose of incenting defendants to pay court debt owed to the county in which expungement was sought.

We find the State's interpretation of the statute unconvincing. First, the State ignores the structure of the statute as whole. "[W]e read statutes as a whole rather than looking at words and phrases in isolation." *Iowa Ins. Inst. v. Core Grp. of Iowa Ass'n for Justice*, 867 N.W.2d 58, 72 (Iowa 2015). When an entire statute relates only to a single specific subject, it seems reasonable to conclude that all provisions in the statute relate to the same subject as a matter of structure and purpose. *See Den Hartog v. City of Waterloo*, 847 N.W.2d 459, 462 (Iowa 2014) ("We have often explained we construe statutory phrases not by assessing solely words and phrases in isolation, but instead by incorporating considerations of the structure and purpose of the statute in its entirety."). For example, in *Iowa Insurance Institute* we concluded a statute that "waive[d] any privilege for the release of . . . information" did not constitute a waiver of work product. *Iowa Ins. Inst.*, 867 N.W.2d at 75. We concluded, instead, the statute related only to a waiver of protection for medical information

because when the statute was considered as a whole "all the other subsections relate[d] to health care services." *Id.* at 72. Similarly, here, the fact that the statute as a whole relates only to the particular case in which the application for expungement was filed counsels in favor of reading section 901C.2(1)(*a*)(2) as also being limited to the particular case in which the application for expungement was filed.

Second, we disagree with the State's purposive interpretation of the statute. It is certainly true one of the critical aspects of statutory interpretation is to determine the purpose of a statute. The purpose of a statute, however, is primarily determined from the language of the statute itself. *See, e.g.*, *Bd. of Governors of Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 373, 106 S. Ct. 681, 688 (1986) ("The 'plain purpose' of legislation, however, is determined in the first instance with reference to the plain language of the statute itself."). Here, the language of the statute does not support the conclusion that the purpose of the statute is to incent the payment of court-ordered financial obligations to the particular county where the application for expungement was filed. Nowhere does the statute indicate the relevant consideration for expungement is the defendant's total court-ordered financial obligations to the particular county in which the application was filed. The statute does not even use the word "county."

In our view, the State's interpretation is actually contrary to the purpose of the statute. "[A] driving concern behind chapter 901C was that a member of the general public—such as an employer doing an informal background check—could access our computerized docket and potentially draw inappropriate inferences from the mere presence of a criminal file relating to an individual, even though the criminal charges were dismissed or the individual was acquitted." *Doe*, 903 N.W.2d at 354. To avoid these

inappropriate inferences and other "stigma," the statute was enacted to facilitate the expungement of the record in criminal cases in which the defendant was acquitted or the case was dismissed. *Id.* Requiring a defendant to satisfy financial obligations in cases other than the case for which expungement was sought frustrates this statutory purpose. This is particularly true with respect to the State's proposed interpretation that requires the satisfaction of all financial obligations in civil cases in the same county.

Consider an example. Iowa Code section 901C.2(1)(*a*)(3) provides a defendant may seek expungement of a criminal file on an expedited basis where the "the defendant was the victim of identity theft or mistaken identity." The expedited process allows a victim of identity theft or mistaken identity to quickly expunge the criminal record to avoid any inappropriate inferences drawn from and stigma associated with a criminal charge. *See Doe*, 903 N.W.2d at 354 (discussing purpose of statute). Except, under the State's interpretation, a victim of identity theft or mistaken identity would not be able to avail herself of the statute and avoid the stigma associated with criminal accusation if she had unpaid financial obligations in a dissolution of marriage case, a personal injury case, a landlord–tenant case, a small claims case, or any other civil case in the county.

We do not see how including civil obligations within the meaning of the statute in any way advances or even remotely relates to the expressed statutory purpose of allowing a defendant to expunge the record of a criminal case in which the defendant was accused but not convicted of a crime. We do understand, however, why the statute would require the defendant to satisfy the financial obligation in the particular case at issue—(1) the legislature wanted to ensure a defendant paid his or her

obligations in the case at issue before being allowed to exercise the right of expungement; and (2) after expungement, it would be practically impossible to collect the defendant's court-ordered financial obligations in the expunged case. The lack of any nexus between the State's proposed interpretation of the statutory text and the clear purpose of the statute militates against the State's interpretation.

In sum, section 901C.2 provides the district court "shall enter an order expunging the record of such criminal case" if the defendant establishes five requisite conditions. Iowa Code § 901C.2(1)(*a*). Upon the defendant establishing each of the requisite conditions, expungement is mandatory. *See State v. Klawonn*, 609 N.W.2d 515, 522 (Iowa 2000) ("Additionally, we have interpreted the term 'shall' in a statute to create a mandatory duty, not discretion."). Iowa Code section 901C.2(1)(*a*)(2) requires the defendant to establish she satisfied all financial obligations "ordered by the court or assessed by the clerk of the district court" in the singular criminal case in which the application for expungement was filed and for which expungement was sought. This interpretation of the statute follows from the ordinary and fair meaning of the text. This interpretation is consistent with the statute's purpose as expressed in the text of the statute. This interpretation is consistent with our prior interpretation of the statute in *Doe*. And this interpretation allows the statute to "be applied predictably, quickly, and in a ministerial way." *Doe*, 903 N.W.2d at 353.

For these reasons, the district court erred in concluding section 901C.2(1)(*a*)(2) required the defendant to establish she satisfied all financial obligations in this case as well as any other case and erred in denying Doe's application on that ground.

We grant Doe's petition for writ of certiorari, sustain the writ, and vacate the order of the district court.  We remand this matter for further proceedings not inconsistent with this opinion.

**WRIT SUSTAINED AND CASE REMANDED.**

All justices concur except Appel, J., who concurs specially and McDermott, J., who takes no part.

**APPEL, Justice (concurring specially).**

I agree with the result in this case. It seems to me the best interpretation of the statute is that the payment of restitution in the case at hand is all that is required for expungement. I think the State's interpretation of "all" in the statute is not entirely unreasonable and therefore gives rise to a degree of ambiguity. But the State's position is unpersuasive. I come to this conclusion in part because of the language of the statute, as ably canvassed by the majority, but also in part because the clear legislative purpose of this remedial statute would be substantially undermined by the State's interpretation of the statute. Further, there are no persuasive countervailing arguments to the majority's interpretation based upon, for example, any germane legislative history or significant linguistic departure from a model statute. So, for me, it is a combination of text, purpose, and absence of meaningful countervailing considerations, that drives the result.

In reaching this result, I do not endorse any sweeping methodological statements about textualism as the proper approach to statutory interpretation. I fully agree that the starting point of analysis of any statute is the language. Analysis of the language matters, and here, the case against the State's interpretation is fairly strong.

But textual analysis is often not the be-all and end-all of statutory interpretation and is merely the starting point. Commentators have noted the difficulty in relying solely on textual analysis, or so called "plain meaning." *See, e.g., State ex rel. Helman v. Gallegos*, 871 P.2d 1352, 1359 (N.M. 1994) (urging caution in applying the plain-meaning rule, stating that "[i]ts beguiling simplicity may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or

another give rise to legitimate (i.e., nonfrivolous) differences of opinion concerning the statute's meaning"); 2A Norman Singer & Shambie Singer, *Sutherland Statutory Construction* § 46.1 (7th ed.), Westlaw (database updated Oct. 2019) (describing issues inherent in the plain-meaning rule in application); *see generally* Michael R. Merz, *The Meaninglessness of the Plain Meaning Rule*, 4 U. Dayton L. Rev. 31 (1979) (critiquing the plain meaning rule and proposing alternative methods of statutory interpretation). A quick look at the legal encyclopedia *Words and Phrases* reveals that many frequently used verbal expressions are ambiguous and have multiple meanings. Ambiguity arises from not only the meaning of particular words, but also "from the general scope and meaning of a statute when all its provisions are examined." *Holiday Inns Franchising, Inc. v. Branstad*, 537 N.W.2d 724, 728 (Iowa 1995). Further, statutory terms cannot always be taken literally when considered in context. *See Iowa Ins. Inst. v. Core Grp. of Iowa Ass'n for Justice*, 867 N.W.2d 58, 72 (Iowa 2015) ("[E]ven if the meaning of words might seem clear on their face, their context can create ambiguity."). Sometimes the text pushes us toward absurd results that rightly drive the interpretation away from textual literalism. *Mall Real Estate, L.L.C. v. City of Hamburg*, 818 N.W.2d 190, 199 (Iowa 2012) (stating that, while the canon of construction *noscitur a sociis* would ordinarily apply, "we cannot apply this canon if its application thwarts legislative intent or makes the general words meaningless").

Because of the challenges of statutory interpretation, we have a long history of looking to legislative history and statutory purposes as so-called "extrinsic aids" in determining the proper approach to statutory interpretation. *See, e.g.*, *Mulhern v. Catholic Health Initiatives*, 799 N.W.2d 104, 113 (Iowa 2011) ("We also consider the legislative history of a statute

when ascertaining legislative intent."); *Sherwin-Williams Co. v. Iowa Dep't of Revenue*, 789 N.W.2d 417, 427 (Iowa 2010) (noting that reliance on legislative history, purpose, and definitions are considered, even if it "leads to a result that seems contrary to the court's expectations"). We also sometimes consider what was not said in statutes, as when an Iowa statute departs from a model act from which it was derived. *See, e.g.*, *State v. Lindell*, 828 N.W.2d 1, 7–8 (Iowa 2013).

Iowa Code section 4.6 (2019) provides that the court may consider seven extrinsic sources in the interpretation of statutes.[1] The statute may raise serious questions of separation of powers, but there is certainly no legislative bar, and in fact we have been permitted, if not encouraged, to examine extrinsic indications of legislative purpose. Indeed, one study of a ten-year timeframe of our court's legislative interpretation cases found that the three members still on the court today utilized legislative history, on average, in 51.7% of the legislative interpretation opinions that they authored.[2] *See generally* Karen L. Wallace, *Does the Past Predict the*

---

[1]Iowa Code section 4.6 provides,

> If a statute is ambiguous, the court, in determining the intention of the legislature, may consider among other matters:
>
> 1. The object sought to be attained.
>
> 2. The circumstances under which the statute was enacted.
>
> 3. The legislative history.
>
> 4. The common law or former statutory provisions, including laws upon the same or similar subjects.
>
> 5. The consequences of a particular construction.
>
> 6. The administrative construction of the statute.
>
> 7. The preamble or statement of policy."

[2]This law review article categorized the percentage of statutory interpretation opinions that each justice authored that cited historical sources. Justice Mansfield cited historical sources in 61.1% of his statutory interpretation opinions, as did Justice Waterman in 56.5% of his opinions, and Justice Appel in 37.5% of my opinions. Karen L. Wallace, *Does the Past Predict the Future?: An Empirical Analysis of Recent Iowa*

*Future?: An Empirical Analysis of Recent Iowa Supreme Court Use of Legislative History as a Window into Statutory Construction in Iowa*, 63 Drake L. Rev. 239 (2015). To the extent the majority opinion's dicta implies that extrinsic aids should not be used to divine legislative purpose or are disfavored, it is sailing dead against Iowa Code section 4.6 and the established recent practice in this court. As a general rule, we have used extrinsic evidence to follow Judge Learned Hand's admonition not to allow hypertextualism "to make a fortress out of the dictionary." *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945).

I have no objection to the result reached in this case; but for me it is a combination of text, purpose, and absence of countervailing argument that reaches that result. I arrive at that decision in its full statutory context. If we are to do our jobs, we judges must continue to have the full panoply of intrinsic and extrinsic tools available to us when confronted with difficult issues of legislative interpretation. Sometimes the text will control. In those cases, there will rarely be appeals. If such cases are appealed, they are handled crisply. But when difficult questions of statutory interpretation arise, we will need a complete toolbox to make the best choices through the art of legislative interpretation.

---

*Supreme Court Use of Legislative History as a Window into Statutory Construction in Iowa*, 63 Drake L. Rev. 239, 270 (2015).